EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Fundación Surfrider, Inc., Capítulo de Rincón; León J. Ritcher<br><br>      Peticionarios<br><br>              v.<br><br>Administración de Reglamentos y Permisos; Jennymar Corporation<br><br>      Recurridos | Certiorari<br><br>2010 TSPR 37<br><br>178 DPR ____ |

Número del Caso: CC-2005-732

Fecha: 17 de marzo de 2010

Tribunal de Apelaciones:

        Región Judicial de Aguadilla

Jueza Ponente:
                Hon. Jocelyn López Vilanova

Abogados de la Parte Peticionaria:

                Lcdo. Miguel Sarriera Román


Abogada de la Parte Concesionaria:

                Lcda. Leonor Porrata-Doria

Oficina del Procurador General:

                Lcdo. Guillermo A. Mangual Amador
                Procurador General Auxiliar


Materia: Revisión Administrativa de la Administración de Reglamentos y Permisos

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Fundación Surfrider, Inc., Capítulo de Rincón; León J. Richter

       Peticionarios

          v.

Administración de Reglamentos y Permisos; Jennymar Corporation

       Recurridos

CC-2005-732

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 17 de marzo de 2010.

La Fundación Surfrider, Inc. y el Sr. Leon J. Richter presentaron una solicitud de *certiorari* ante este Tribunal para revisar la sentencia emitida por el Tribunal de Apelaciones. Dicha sentencia confirmó la determinación de la Administración de Reglamentos y Permisos (A.R.Pe.) que aprobó un anteproyecto con variaciones a los reglamentos de zonificación. Resolvemos que los peticionarios carecen de legitimación para presentar el recurso de revisión judicial que instaron ante el Tribunal de Apelaciones.

I

Jennymar Corporation solicitó a A.R.Pe. la aprobación de un anteproyecto para la construcción del desarrollo residencial, Marina Los Sueños, en un solar ubicado en un distrito de zonificación residencial turístico (RT-0), en la Carretera Estatal 413, km 1.1, del Barrio Ensenada de Rincón. La agencia celebró vistas públicas en las que los peticionarios, el señor Richter y la Fundación Surfrider, se opusieron a las variaciones solicitadas para la aprobación del anteproyecto objeto de esta controversia. La parte proponente, Jennymar Corporation, solicitó variaciones respecto a altura, densidad poblacional y área bruta de piso. Luego de estas vistas públicas y de la recomendación del oficial examinador, A.R.Pe. aprobó el anteproyecto de manera condicionada y concedió ciertas variaciones[1] a los reglamentos aplicables. Según surge de la resolución, la autorización del anteproyecto fue condicionada al cumplimiento de ciertos requisitos. Los peticionarios, el señor Richter y la Fundación Surfrider, solicitaron reconsideración. La agencia la denegó y los peticionarios acudieron al Tribunal de Apelaciones.

La Fundación Surfrider alegó que es una entidad cuyos propósitos son la conservación de los océanos y la

---

[1] La variación es un mecanismo mediante el cual se dispensa del cumplimiento de los requerimientos propios de los distritos de zonificación.

CC-2005-732                                                3

protección del acceso a las playas. Por su parte, el señor Richter alegó (1) que reside "en el Barrio Ensenada de Rincón, cerca del proyecto objeto del caso de autos", (2) que actualmente está afectado por un problema de distribución de agua, (3) que "entiende que este problema se agravará con el aumento de consumo que significa este proyecto", y(4) "que sus intereses se verán afectados porque este tipo de desarrollo aumenta la densidad poblacional y por lo tanto rompe la armonía y altera las características de su vecindario". Ap. Cert., pág.120-121. Dicho foro apelativo confirmó los méritos de la decisión de la agencia administrativa aunque coincidió con la parte recurrida en que "los recurrentes no presentaron prueba 'de en qué manera sus intereses quedarán afectados...". Ap. de la petición de *certiorari*, pág. 166.

Inconformes con esta determinación, los peticionarios presentaron el recurso que nos ocupa en el que señalaron, en síntesis, que erró el Tribunal de Apelaciones al confirmar la determinación de la agencia de aprobar el anteproyecto en controversia y permitir las variaciones que se solicitaron. Aunque concedimos término a A.R.Pe. para que se expresara en torno a lo solicitado, la agencia no compareció y expedimos el auto el 17 de febrero de 2006. Posteriormente, todas las partes presentaron sus alegatos. La parte concesionaria, Jennymar Corporation, señaló que los peticionarios

carecen de legitimación activa para presentar el recurso de revisión judicial. Con el beneficio de dichas comparecencias y por los fundamentos que expondremos a continuación, resolvemos que los peticionarios no tienen legitimación para presentar el recurso que nos ocupa.

II-A

Como bien mencionamos en Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 720, (1980) el principio de justiciabilidad como autolimitación del ejercicio del poder judicial responde en gran medida al papel asignado a la judicatura en una distribución tripartita de poderes, diseñada para asegurar que no intervendrá en áreas sometidas al criterio de otras ramas de gobierno. Véase, además, Flast v. Cohen, 392 U.S. 83 (1968). Por eso, el poder de revisión judicial sólo puede ejercerse en un asunto que presente un caso o controversia, y no en aquellas circunstancias en que se presente una disputa abstracta cuya solución no tendrá consecuencias para las partes. Véase, E.L.A. v. Aguayo, 89 D.P.R. 552, 558-59 (1958). Esto responde a que "los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas". E.L.A. v. Aguayo, id., pág. 559. Véase, además, Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992). De esta forma, nos aseguramos de que el promovente de una acción posea un interés en el pleito

"de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". Noriega v. Hernández Colón, 135 D.P.R. 406, 427 (1994).

Una de las doctrinas de autolimitación derivadas del principio de "caso o controversia" es la legitimación de la parte que acude ante el foro judicial. En el ámbito del derecho administrativo, cuando un litigante solicita la revisión judicial sobre la constitucionalidad de una acción o decisión administrativa a través de un pleito civil, éste tiene que demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejercita y el daño alegado; y (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley. Col. de Peritos Electricistas v. A.E.E., 150 D.P.R. 327 (2000); Hernández Torres v. Hernández Colón, et. al., 131 D.P.R. 593, 599 (1992).

Si la parte litigante es una asociación, ésta tiene legitimación para solicitar la intervención judicial por los daños sufridos por la agrupación y para vindicar los derechos de la entidad. Col. de Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559 (1989). Cuando la asociación comparece en defensa de sus intereses, le corresponde demostrar un daño claro, palpable, real,

inmediato, preciso, no abstracto o hipotético a su colectividad. Véase, Col. de Ópticos de P.R. v. Vani Visual Center, id.; Col. de Peritos Electricistas v. A.E.E., supra. La agrupación también puede acudir al foro judicial a nombre de sus miembros aunque ésta no haya sufrido daños propios. A tales efectos, este Tribunal estableció que cuando la asociación litiga a nombre de sus miembros tiene que demostrar que el miembro (1) tiene legitimación activa para demandar a nombre propio; (2) que los intereses que se pretenden proteger están relacionados con los objetivos de la organización; y (3) que la reclamación y el remedio solicitado no requieren la participación individual. Col. de Ópticos de P.R. v. Vani Visual Center, supra.

Respecto al requisito del daño que tiene que sufrir la persona natural o jurídica que acude ante el foro judicial, reconocimos que la lesión se puede basar en consideraciones ambientales, recreativas, espirituales o estéticas. Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 723 (1974). Véase, además, García Oyola v. Junta de Calidad Ambiental, 142 D.P.R. 532 (1997). A modo ilustrativo, véanse, Friends of the Earth v. Laidlaw Environmental Services, 528 U.S. 167 (2000); Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 154 (1970). Sin embargo, esto no quiere decir que "la puerta está abierta de par en par para la consideración de cualquier caso que desee incoar

cualquier ciudadano en alegada protección de una política pública". Salas Soler v. Srio de Agricultura, supra, págs. 723-724.

Ahora bien, cuando la intervención judicial surge en el contexto del procedimiento adjudicativo mediante el recurso de revisión judicial, la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2101 y ss., establece los criterios que tiene que demostrar aquél que interese acudir al foro judicial en revisión de la determinación administrativa. El Artículo 4.006 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 201 de 22 de agosto de 2003, 4 L.P.R.A. sec. 24(y) le confiere competencia apelativa al Tribunal de Apelaciones para revisar las decisiones, órdenes y resoluciones finales de los organismos o agencias administrativas. Por su parte, la Sección 4.6 de la Ley de Procedimiento Administrativo Uniforme, supra, sec. 2176, establece que el Tribunal de Apelaciones revisará las decisiones, órdenes y resoluciones finales de la agencia. Cualquier parte adversamente afectada por la resolución del Tribunal de Apelaciones podrá solicitar la revisión mediante la presentación de un recurso de certiorari ante el Tribunal Supremo. Véase, además, la Sec. 4.7 de la Ley de Procedimiento Administrativo Uniforme, id., sec. 2177.

Por tanto, toda persona natural o jurídica que cuestione la actuación de la agencia mediante el recurso de revisión judicial tiene que demostrar que goza de legitimación activa a base de las disposiciones de este cuerpo legal.

Como bien afirma el profesor Demetrio Fernández Quiñones, es imperativo que el recurrente satisfaga el requisito de legitimación al presentar el recurso de revisión judicial. D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Colombia, Ed. Forum, 2001, pág. 500. Añade el profesor Fernández Quiñones que la legitimación necesaria para presentar el recurso de revisión debe distinguirse de la legitimación requerida para participar en la agencia administrativa y opina que "el hecho de haber participado en el proceso administrativo no les asegura que posean legitimación necesaria y requerida para la intervención judicial". Fernández Quiñones, id., pág. 500.

En ese sentido, este Tribunal enfatizó en Junta Dir. Portofino v. P.D.C.M., Opinión de 2 de abril de 2008, 2008 T.S.P.R. 54, 2008 J.T.S. 75, 173 D.P.R. ___ (2008), que es necesario distinguir al participante en el procedimiento administrativo de la "parte" para fines de la revisión judicial. Es decir, no todo el que participa en el procedimiento administrativo tiene legitimación activa para ser parte en la revisión judicial.

El profesor Richard J. Pierce, Jr., lo explica así:

*The best reasoned opinions, recognize, however, that the law governing standing to participate in an agency proceeding is not identical to the law governing standing to obtain review of an agency proceeding in which the agency takes the action at issue. In Consolidated Edison Co. v. O´Leary, 131 F.3d. 1475 (Fed. Cir. 1997), for instance, the court first held that a party lacked standing to obtain review of an agency decision not to initiate an enforcement action. It then distinguished between standing to obtain review and standing to participate in an agency proceeding:*

*"The principles underlying the agency´s intervention practices, however, are entirely different from the principles that apply in the present context. The (agency) is free to permit third parties to participate in proceedings before it, for such assistance as those parties may offer, without creating a right in those parties to review a negative decision that the (agency) may ultimately make."*

R.J. Pierce, Jr., Administrative Law Treatise, 4ta ed., New York, Aspen Publishers, Inc., 2002, Vol. III, p. 1202-1203.

Conforme con lo anterior, veamos cuáles son los criterios de legitimación que tiene que demostrar aquél que recurre ante el foro judicial mediante el mecanismo de revisión establecido en la Sección 4.2 de la L.P.A.U., supra.

B

Según la Sección 4.2 de la L.P.A.U., id., sec. 2172, tiene legitimación para presentar el recurso de revisión judicial una parte adversamente afectada por una orden o resolución final de una agencia, y que haya agotado todos

los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente. Como vemos, para que el litigante pueda presentar el recurso de revisión judicial tiene que satisfacer dos requisitos: (1) ser parte y (2) estar "adversamente afectado" por la decisión administrativa.[2] Además, deberá agotar los remedios administrativos y recurrir dentro del término provisto. Nos corresponde, entonces, definir ambos conceptos.

Según expone la Sección 1.3 de la Ley de Procedimiento Administrativo Uniforme, id., sec. 2102(j), una parte es (1) toda persona o agencia autorizada por ley a quien se dirija específicamente la acción de una agencia o que sea parte en dicha acción; así como (2) la persona que se le permita intervenir o participar; (3) que haya radicado una petición para la revisión o cumplimiento de una orden; (4) o que sea designada como parte en dicho procedimiento. Conforme con lo anterior, es parte para efectos de la revisión judicial el promovido o el promovente, esto es, la persona objeto de la acción administrativa. También son partes para fines de la revisión judicial aquellas personas naturales o jurídicas a quienes por haber participado e intervenido

---

[2] Las leyes que rigen el procedimiento administrativo en muchas jurisdicciones estatales contienen disposiciones similares en las que se exigen estos dos requisitos. Véase, W. A. McGrath y otros, Project: State Judicial Review of Administrative Action, 43 Admin. L. Rev. 571, 634 (1991).

en el procedimiento administrativo, la agencia las hizo partes –previa solicitud formal al efecto y debidamente fundamentada– mediante el mecanismo de intervención. Véase, Ley de Procedimiento Administrativo Uniforme, Sec. 3.5, supra, sec. 2155; JP, Plaza Santa Isabel v. Cordero Badillo, Opinión de 14 de octubre de 2009, 2009 T.S.P.R. 154, 2009 J.T.S. 163, 177 D.P.R. ___ (2009). Respecto al interventor, véase San Antonio Maritime v. P.R. Cement Co., 153 D.P.R. 374 (2001). Como vemos, el legislador proveyó el mecanismo de intervención para que las personas naturales o jurídicas que tengan un interés legítimo y sustancial que pueda verse adversamente afectado por la actuación de la agencia sean consideradas partes en el procedimiento administrativo con todo lo que ello implica. JP, Plaza Santa Isabel v. Cordero Badillo, supra. Claro está, si la agencia deniega la solicitud de intervención, la parte adversamente afectada por la denegación puede procurar la revisión judicial. Véanse, Ley de Procedimiento Administrativo Uniforme, Sec. 1.3(e), supra, sec. 2102(e); Sec. 3.6, supra, sec. 2156; JP, Plaza Santa Isabel v. Cordero Badillo, supra.

Una vez resuelto quiénes son "partes" para fines de la revisión judicial, resta definir qué significa estar "adversamente afectada". Esta frase no está definida en la legislación. Al interpretarla, es meritorio percatarnos que el legislador utilizó el adverbio "adversamente" para cualificar la afectación, por lo que

no es suficiente que la actuación gubernamental tenga un efecto sobre el litigante sino que ese efecto tiene que ser adverso o desfavorable a sus intereses. Al respecto, hemos interpretado el concepto de afectación de un litigante a base de la noción de daño, ya sea económico, estético o recreativo. Véase, Salas Soler v. Srio. de Agricultura, supra. Esto dirige el análisis hacia la evaluación de un daño o lesión.

Del historial legislativo se desprende que la aprobación de nuestra ley fue inspirada por la experiencia en Estados Unidos con la Ley de Procedimiento Administrativo federal (*Administrative Procedure Act*). Véase, Informe Conjunto de las Comisiones de Gobierno Estatal, Asuntos Municipales y de lo Jurídico sobre el P. del S. 350, abril de 1987; Pagán Ramos v. F.S.E., 129 D.P.R. 888, 898 (1992). Por tal motivo, nuestra legislación acogió muchas de las doctrinas de la A.P.A. De igual forma, tomó en consideración el desarrollo del derecho administrativo en el foro federal y en los tribunales estatales, así como la experiencia de algunos estados con el *Model State Administrative Procedures Act*. Véase, Informe Conjunto, supra; Pagán Ramos v. F.S.E., supra. Así pues, es meritorio referirnos, de modo ilustrativo, a la interpretación que se le ha dado a nivel estatal y federal a la frase "adversamente afectado" en el contexto del derecho a la revisión judicial de los organismos administrativos. Nos basamos

en la norma de hermenéutica que dispone que la adopción de una disposición de ley que proviene de otra jurisdicción hace presumir que también se adoptó la interpretación dada a dicha ley en su lugar de origen. Véanse, Pueblo v. Matos, 83 D.P.R. 335 (1961); Lagarreta v. Tesorero, 55 D.P.R. 22 (1939). Claro, ésta es una regla general y no es de aplicación universal sino que está sujeta a muchas excepciones y limitaciones. Véase, Pueblo v. Matos, supra. Por eso, siempre es meritorio evaluar el historial de la aprobación del estatuto y las realidades a la que se dirige la ley local. Véase, Salas Soler v. Srio de Agricultura, supra.

Al interpretar las disposiciones de la *Administrative Procedure Act* federal, el Tribunal Supremo federal manifestó, entre otros asuntos, que el litigante que impugna la determinación de la agencia tiene que demostrar que está adversamente afectado o agraviado (*adversely affected or aggrieved*) esto es, que sufre o sufrirá una lesión propia y particular (*injury in fact)* a sus intereses y que su lesión fue causada por la determinación administrativa que se impugna mediante la revisión judicial. Sierra Club v. Morton, 405 U.S. 727 (1972). Así también, en varias jurisdicciones estatales se ha seguido la interpretación federal sobre el análisis de la lesión propia y particularizada (*injury in fact*). Véase, W. A. McGrath y otros, Project: State Judicial Review of Administrative Action, 43 Admin. L. Rev. 571,

637-638 (1991)("*The injury in fact requirement in federal court parallels that utilized by most state courts.*").

Esta definición de la frase "adversamente afectado" procura que el litigante que interese solicitar la revisión judicial demuestre que sufre o sufrirá un efecto adverso, daño o lesión a sus intereses particulares de modo que la intervención judicial se dé en el contexto de una controversia real con el propósito de dar un remedio a un litigante verdaderamente afectado. Véase, K. C., Davis, Administrative Law Text, Ed. West Publishing Co., 3ra ed., 1972, p. 429 ("*Limiting the use of courts to those who have an interest at stake does seem entirely reasonable and desirable.*"). Respecto a lo anterior, Davis opina:

> *A person whose legitimate interest is injured in fact or imminently threatened with injury by governmental action should have standing to challenge that action.... The main part of this proposal is the same as the test of "adversely affected in fact" under the Administrative Procedure Act.... A member of the public who is injured in fact should have standing, even though all other members of the public or many of them are injured as he is, and such a member of the public should be allowed to argue for the interest of others, including that of the public. But a person who is not injured in fact by governmental action he seeks to challenge should be denied standing, even if he is trying to represent what he believes to be the public interest.*

Davis, id., p.438-439.

En síntesis, el análisis efectuado en otras jurisdicciones ha concluido, acertadamente, que una parte adversamente afectada es aquella que sufre o sufrirá un

daño causado por la actuación administrativa. Véase, Schwartz, supra, p. 497 ("*Standing exists when plaintiff alleges that he has suffered adverse effect as a result of the challenged agency action-that it has caused him injury, economic or otherwise.*").

Luego de considerar el texto de la ley, el historial legislativo, la experiencia en la jurisdicción federal y las estatales, así como la doctrina de legitimación activa en el foro local antes discutida, concluimos que la frase "adversamente afectada" significa que la parte recurrente tiene un interés sustancial en la controversia porque sufre o sufrirá una lesión o daño particular que es causado por la acción administrativa que se impugna mediante el recurso de revisión judicial. El daño tiene que ser claro, específico y no puede ser abstracto, hipotético o especulativo. Esto asegura que resolvamos "controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas". E.L.A. v. Aguayo, supra. Conforme con lo anterior, para que un litigante pueda solicitar la intervención del tribunal mediante el mecanismo de revisión judicial, ésta tiene que demostrar (1) que es parte y (2) que es o será adversamente afectada por la actuación administrativa que se impugna.

Es claro, según menciona el profesor Fernández Quiñones, que la evaluación de la legitimación activa de la "parte obvia" no presenta problema alguno ya que ésta

es la persona que ha sido sujeto u objeto de la decisión administrativa. Esto responde a que la intervención administrativa con esta parte puede causarle un daño ya sea ordenándole que cese y desista de actuar de determinada manera, confirmar o revocar un despido o negarle un permiso, entre otras actuaciones administrativas posibles. Véase, Fernández Quiñones, op. cit., pág. 500.

Así también, en la mayoría de las situaciones, evaluar la legitimación activa del interventor o de aquél que se hizo formar parte tampoco debe confrontar mayor dificultad, ya que la agencia lo hizo parte porque demostró ante ella el interés sustancial que sería afectado adversamente por la decisión administrativa. Como bien señala la doctrina, el asunto de legitimación activa para la revisión judicial está relacionado con el asunto sobre quién tiene derecho a ser oído ante la agencia. Schwartz, op. cit., pág. 496. Por tanto, en la mayoría de los casos aquél que tiene derecho a ser oído ante la agencia como "parte" según lo define la ley, también tiene derecho a revisar la determinación administrativa ante el foro judicial. Esto responde a que, usualmente, quien tiene derecho a ser oído es aquel que podría ser afectado adversamente por la determinación administrativa. Ahora bien, el análisis en uno u otro caso es si la parte sufrirá un efecto adverso. Véase, Schwartz, op. cit., pág. 294 ("*As a general proposition,*

*one who has the right to be heard before the agency should have standing to seek review and vice versa. The test in either case is that of adverse effect, existence of such an effect that is not too remote should give the individual the right to appear at both the administrative and judicial level.")*.

Usualmente el interventor es aquél que podría ser adversamente afectado por la decisión administrativa. Es ante la amenaza de un daño a sus intereses que una persona que no ha sido parte original ante la agencia procura la intervención. Una vez se convierte en interventor, la ley le reconoce entonces, la legitimación activa para presentar una revisión judicial de la determinación final de la agencia si ésta le afecta adversamente. Véase, Junta Dir. Portofino v. P.D.C.M., supra; Lugo Rodríguez v. J.P., 150 D.P.R. 29 (2000). Es decir, si el interventor –por ser parte– recurre ante el tribunal y demuestra que la decisión administrativa le afecta adversamente, esto es que sufrirá un daño particular, concreto y que no sea especulativo como resultado de la actuación administrativa, éste tendrá legitimación activa para presentar el recurso de revisión judicial al amparo de la L.P.A.U., supra.

Claro está, esto no quiere decir que para evaluar el interés legítimo del que solicite intervención en el procedimiento administrativo se tenga que demostrar que ese solicitante tiene una acción legitimada. Como bien

menciona el Prof. Fernández Quiñones, "la frase [interés legítimo] no significa que se posea una acción legitimada". El criterio central para determinar si se posee legitimación es si la persona disfruta de un interés adversario en el procedimiento. Fernández Quiñones, op. cit., pág. 145. Añade el Prof. Fernández Quiñones que ese no puede ser el criterio porque la agencia tiene un ámbito de discreción amplio por lo flexible que son sus procedimientos y porque, si le exigiéramos tal interés, estaríamos llevando a cabo una incursión en el terreno de lo que define a una parte. Una parte puede carecer de legitimación activa para instar el recurso de revisión judicial, pero puede ser considerada como agraviada e interesada en participar e intervenir en el procedimiento administrativo. Fernández Quiñones, id.; Véase, San Antonio Maritime v. P.R. Cement Co., supra.

Además, la ley le reconoce a la agencia liberalidad para evaluar los criterios que tiene que tomar en consideración para determinar si procede la intervención. Por lo tanto, cónsono con lo que resolvió este Tribunal en San Antonio Maritime v. P.R. Cement Co., id., al evaluar una solicitud de intervención la agencia no tiene que exigir que el solicitante tenga una acción legitimada ya que las agencias no tienen una limitación de caso o controversia. Ahora bien, si ese interventor que ya es "parte" recurre en revisión y demuestra que es o estará adversamente afectado por la determinación de la agencia

la ley le reconoce entonces, la legitimación activa para presentar una revisión judicial de la determinación final de la agencia al amparo de la Sección 4.2 de la L.P.A.U, supra. En esa situación estamos ante un caso y una controversia real.

En cuanto a la legitimación activa de las asociaciones, éstas pueden solicitar la revisión si son partes y la actuación les afecta adversamente. Como bien mencionamos anteriormente, este Tribunal ha reconocido que si la parte litigante es una asociación, ésta tiene legitimación para solicitar la intervención judicial por los daños sufridos por la agrupación y para vindicar los derechos de la entidad. Claro está, si la asociación comparece en defensa de sus intereses, le corresponde demostrar un daño claro, palpable, real, inmediato, preciso, no abstracto o hipotético a su colectividad. Si la agrupación acude al foro judicial a nombre de sus miembros aunque ésta no haya sufrido daños propios, tiene que demostrar que uno de sus miembros (1) tiene legitimación activa para demandar a nombre propio; (2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren la participación individual.

Respecto al requisito del daño que tiene que sufrir la persona natural o jurídica que acude ante el foro judicial, hemos reconocido que la lesión se puede basar

en consideraciones ambientales, recreativas, espirituales o estéticas. Específicamente, respecto a la lesión ambiental, en Sierra Club v. Morton, supra, el Tribunal Supremo federal reconoció la legitimación activa de las organizaciones ambientales dedicadas a la conservación y protección del ambiente, algo que posteriormente adoptamos en Salas Soler v. Srio de Agricultura, supra. El Tribunal Supremo federal manifestó en Sierra Club v. Morton, supra:

> Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.

Sierra Club v. Morton, id., pág. 734.

Sin embargo, el Tribunal Supremo federal manifestó que el requisito de demostrar una lesión propia y particularizada significa que el recurrente tiene que estar entre las personas o entidades afectadas por la decisión de la agencia. Sierra Club v. Morton, id., págs. 734-735 ("[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."). En ese sentido, el mero interés en el asunto no es suficiente para establecer que una parte fue adversamente afectada por la decisión de la agencia sin importar cuán bien cualificada esté la organización recurrente para evaluar el problema. Así lo enfatizó el Tribunal:

*It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review.... But a mere "interest in a problem" no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization adversely affected' or "aggrieved".*

Sierra Club v. Morton, id., pág. 739.

El Tribunal enmarcó la discusión en el requisito constitucional de caso y controversia, y enfatizó que requerir que la parte recurrente alegue hechos que demuestren que es o será una parte adversamente afectada no aísla o evita la revisión judicial de las acciones del ejecutivo ni es un obstáculo para proteger el interés público mediante el proceso judicial.

*[T]he requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interest form being protected through the judicial process.*

Sierra Club v. Morton, id.

Por el contrario, esta exigencia procura que la decisión sobre si se acude o no a revisar la actuación de la agencia la tome la persona realmente afectada por la decisión que se impugna.

*It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome. This goal would be undermined were we to construe the APA to authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process.*

Sierra Club v. Morton, id.

Conforme con lo anterior, Davis opina:

> *An organization favoring a particular policy should not have standing to challenge any governmental action contrary to that policy unless it represents members who are in fact adversely affected.*

Davis, op. cit., pág. 438.

En síntesis, para que una organización pueda acudir al foro judicial por un interés ambiental, estético o recreativo, ésta tiene que demostrar que (1) al menos uno de sus miembros tendría legitimación activa y (2) que los intereses del miembro que se procuran proteger están íntimamente relacionados con los objetivos o propósitos de la organización.

Por último, es menester reafirmar que "nuestro sistema es uno adversativo de derecho rogado que descansa en la premisa de que las partes, cuidando sus derechos e intereses, son los mejores guardianes de la pureza de los procesos, y de que la verdad siempre aflore". Véanse, JP, Plaza Santa Isabel v. Cordero Badillo, supra; S.L.G. Llorens v. Srio. de Justicia, 152 D.P.R. 2, 8 (2000). Claro está, hemos reconocido que los requisitos de legitimación activa deben interpretarse de forma flexible y liberal, particularmente al atender reclamos dirigidos contra las agencias y funcionarios gubernamentales. García v. Junta de Planificación, 140 D.P.R. 649 (1996). Sin embargo, esto no implica que se haya abandonado "el requisito de que todo litigante tiene que demostrar que ha sufrido un daño concreto y palpable para que los

tribunales consideren su reclamo en los méritos". Romero Barceló v. E.L.A., 169 D.P.R. 460, 511 (2006) (Opinión disidente de la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ.).

En el contexto de la revisión judicial de la actuación administrativa, este Tribunal ha manifestado que la persona o entidad que pretenda solicitar la intervención judicial tiene el peso de probar su legitimación en todas las etapas. Corresponde al litigante demostrar que tiene no solamente la capacidad para demandar sino que también tiene legitimación activa. Col. de Peritos Electricistas v. A.E.E., supra, pág. 341-342. Así también, aquél que solicite la intervención judicial mediante el recurso de revisión provisto por la Ley de Procedimiento Administrativo Uniforme tiene el peso de demostrar que tiene legitimación conforme las disposiciones de dicha ley. Esta legitimación se demuestra mediante la alegación de hechos que permitan el foro judicial constatar que es parte adversamente afectada por la decisión que se impugna. Claro está, aquí también rige la norma que establece que cuando se cuestiona la legitimación de una parte para entablar un pleito, el juzgador debe tomar como ciertas las alegaciones de hechos del reclamante e interpretarlas desde el punto de vista más favorable a éste. Crespo Rivera v. Cintrón Rivera, 159 D.P.R. 290, 299 (2003).

Conforme con el derecho expuesto, procedemos a auscultar si los peticionarios, la Fundación Surfrider y el señor León J. Richter, han demostrado tener legitimación activa para presentar el recurso de revisión judicial ante el Tribunal de Apelaciones así como el recurso de *certiorari* que nos ocupa.

III

Es meritorio señalar que para este caso y debido a que la norma sobre el requisito de parte fue modificada con efectividad prospectiva en JP, Plaza Santa Isabel v. Cordero Badillo, supra, luego de los hechos que dan lugar a esta controversia, el requisito de parte lo evaluaremos según la figura del "participante activo" emitida en Lugo Rodriguez v. J.P., supra. Según esta figura, se consideraba parte para fines de la revisión judicial a aquél que participó activamente durante el procedimiento administrativo, y cuyos derechos y obligaciones pueden verse adversamente afectados por la acción o inacción de la agencia. Junta Dir. Portofino v. P.D.C.M , supra; Ocean View v. Reina del Mar, 161 D.P.R. 545 (2004); Lugo Rodríguez v. J.P., supra. Conforme con lo anterior, para que al reclamante se le considere "parte" con derecho a revisión judicial bajo la figura del participante activo establecida en Lugo Rodríguez v. J.P., id., el litigante tiene que demostrar que "sus derechos y obligaciones pueden verse afectados por la acción o inacción de la agencia", esto es, un daño o lesión particularizada. Por

tanto, procedemos a evaluar el segundo requisito para poder tener legitimación activa para procurar la revisión judicial, esto es, si los peticionarios serán afectados adversamente por la actuación administrativa que se impugna.

En este caso, los peticionarios impugnaron una determinación de A.R.Pe. en la que se aprobó un anteproyecto con variaciones al predio objeto de esta controversia ubicado en un distrito de zonificación RT-0. Se solicitaron variaciones sobre los requisitos de densidad, altura y área bruta de piso. Según la norma antes discutida, para poder impugnar esta determinación los peticionarios tenían que demostrar que sufrirían un daño o lesión particular por la aprobación del anteproyecto y, por tanto, cómo las variaciones les afectaban adversamente. El hecho de ser vecino, sin más, no le confiere legitimación a quien impugne una determinación de una agencia, ya sea en casos de permisos de construcción o en casos de zonificación y planificación. Siempre es imprescindible que el recurrente satisfaga el requisito de daño y la relación causal de esa lesión con la actuación administrativa.

Según la norma aplicable, el señor Richter no logró demostrar que se verá adversamente afectado por la determinación administrativa. En la comparecencia ante el Tribunal de Apelaciones así como en el recurso de *certiorari* presentado ante nos, el señor Richter

escuetamente alegó lo siguiente: (1) que reside "en el barrio Ensenada de Rincón, cerca del proyecto objeto del caso de autos", (2) que actualmente está afectado por un problema de distribución de agua, (3) que "entiende que este problema se agravará con el aumento de consumo que significa este proyecto", (4) "que sus intereses se verán afectados porque este tipo de desarrollo aumenta la densidad poblacional y por lo tanto rompe la armonía y altera las características de su vecindario". Tanto en los foros judiciales como en las comparecencias en el procedimiento administrativo, el señor Richter escuetamente alegó que es "vecino" del proyecto, pero no indicó dónde reside. Lo único que aparece en la hoja de notificación del recurso ante nuestra consideración es un apartado postal. No se alegó en el recurso la dirección residencial del copeticionario y cuán próxima está la alegada residencia al proyecto en cuestión. De hecho, en todas las comparecencias ante la agencia y ante los foros judiciales, se establece dónde se ubicará el proyecto en el Barrio Ensenada. Sin embargo, no hay dato alguno sobre dónde reside Richter ni cuán próxima está su residencia del proyecto en cuestión.

Era necesario que el copeticionario estableciera la proximidad de su residencia con relación al proyecto ya que los intereses que alega que se verán afectados por la decisión administrativa dependen de ese hecho. La distancia entre la residencia de Richter y el proyecto es

un elemento clave para poder evaluar si el alegado aumento en el ruido y movimiento vehicular le afectaría. Ni siquiera sabemos si el señor Richter tiene que transitar por el área cercana al proyecto. También era necesario que nos indicara su ubicación respecto al proyecto ya que se alega que éste, según aprobado con las variaciones, "rompe la armonía y altera las características de su vecindario". El hecho de que el copeticionario viva en el Barrio Ensenada no significa que resida en el mismo vecindario en dónde estará ubicado el proyecto, pues un barrio puede ser tan extenso que contenga varios vecindarios. De hecho, ni siquiera se alegó que el peticionario reside en el mismo vecindario dónde se desarrollaría el proyecto.

Por último, el señor Richter alega que se verá afectado por la decisión administrativa ya que "entiende" que el alegado problema de distribución de agua se intensificará con la construcción del proyecto. Ésta es una alegación especulativa y conclusoria. Además, como no se alegó la ubicación de la residencia al predio del proyecto ni la proximidad, no podemos saber si el sector donde está ubicada la residencia se suple de la misma toma de agua que el proyecto. Estamos ante meras opiniones y conclusiones de los peticionarios sin datos que las sustenten.

Ante la insuficiencia de una base fáctica no podemos determinar si el copeticionario, el señor Richter, sería

afectado por la determinación administrativa. La escueta alegación sobre su calidad de "vecino del proyecto" no puede darle legitimidad al copeticionario para impugnar la decisión administrativa. Permitir que una alegación tan imprecisa y general pueda conferir legitimación activa, abriría las puertas para que cualquier persona que participe en un procedimiento administrativo y se limite a alegar que es vecino del proyecto impugnado, reclame ser parte para fines de la revisión judicial sin establecer o demostrar que, en efecto, sus derechos se afectarían por la determinación final de la agencia. Resuelto esto, procedemos a evaluar la legitimación de la copeticionaria, la Fundación Surfrider.

B

Según discutimos anteriormente, una asociación puede presentar un recurso de revisión judicial a nombre propio o en representación de sus miembros. Evaluaremos primero la legitimación de la asociación para presentar el recurso de revisión judicial a nombre propio.

La Fundación Surfrider alegó tener interés en la controversia porque entre sus objetivos institucionales, se encuentra la protección y conservación de los océanos así como la protección de los accesos a las playas. En ese sentido, la Fundación puede que tenga interés en participar en el procedimiento adjudicativo ante la agencia, pues el proyecto impugnado se llevará a cabo en el Municipio de Rincón, reconocido por sus costas y sus

playas. Sin embargo, esto no es suficiente para cumplir con el interés requerido para ser "parte" con derecho a revisión judicial, según la norma discutida.

La Fundación Surfrider no alegó ni demostró que sufrirá un daño o lesión propia como resultado de la actuación administrativa. Nuestro sistema constitucional no le permite convertirse en un vigilante privado del interés público (*private attorney general*). Como bien discutimos anteriormente, cuando una organización alega interés en la controversia conforme a los objetivos ambientales que promueve es necesario que demuestre que al menos uno de sus miembros sufriría una lesión particular y no generalizada, ya sea estética o ambiental, como resultado de la actuación administrativa. Claro está, los intereses que se pretenden proteger tienen que estar relacionados con los objetivos de la organización. Como ésta no demostró una lesión propia, procede evaluar si alguno de los miembros de la Fundación tiene legitimación activa para impugnar la decisión administrativa y si el interés individual que se pretende proteger está íntimamente relacionado con los objetivos de la organización.

La Fundación Surfrider señaló que el señor Richter y el señor John J. Murray son miembros de la organización. Ya resolvimos que el señor Richter no tiene legitimación activa para presentar el recurso de revisión judicial. A igual conclusión llegamos respecto al otro miembro que se

incluye en el recurso de revisión judicial ante el Tribunal de Apelaciones y en el recurso de *certiorari* que nos ocupa, el Sr. John J. Murray, ya que las alegaciones son las mismas para ambos.

Además, aun si un integrante de la Fundación tuviera legitimación activa para impugnar la decisión, la organización no cumplió con el requisito de demostrar que el interés del miembro está relacionado con los objetivos de la organización. Este caso trata sobre la impugnación de un proyecto de construcción y las variaciones a los reglamentos de zonificación. Según los Artículos de Incorporación, los objetivos de la Fundación Surfrider son los siguientes:

1. *To promote the protection and enjoyment of the world´s waves and beaches, for all people, through conservation, activism, research and education;*

2. *To preserve and protect unique and irreplaceable surfing areas, both along the California Coastline and elsewhere in the world, and to promote public awareness of and public Access to such areas;*

3. *To provide educational opportunities for public schools, youth groups and similar community agencies and organizations which promote the sport of surfing and public safety in surfriding areas;*

4. *To engage in scientific research and to disseminate scientific reports on the design of surfing equipment and the safety and adequacy of surfing products as well as surfing areas;*

5. *Such other purposes as are reasonably related thereto.*

En síntesis, como bien alegó la Fundación, su objetivo principal es promover el disfrute de los océanos

y las playas mediante la conservación, participación, investigación y educación. Estos objetivos, aunque loables, no están relacionados con el interés que se pretende, esto es, los daños que alegadamente se causarían por la construcción de un proyecto aprobado con variaciones a los reglamentos de zonificación. Ninguno de los miembros alegó que el proyecto afectará su derecho al acceso y disfrute de los océanos y las playas. De hecho, en las fotografías aéreas presentadas se atisba que el proyecto ni siquiera colinda con la playa y por lo tanto, no obstruye el acceso a la costa. Véase, Apéndice de la Solicitud de *certiorari*, pág. 90.

La Fundación alegó que en algún momento trabajó en "temas de zonificación y planificación en el área de Rincón". Sin embargo, según surge de los Artículos de Incorporación, los objetivos de la organización no están relacionados con esos asuntos. Para que las asociaciones puedan comparecer a nombre de sus miembros, éstas tienen que fungir como representantes apropiados en defensa de los intereses de sus miembros que serán afectados por la determinación administrativa. A modo ilustrativo, cabe señalar que en casos como el de autos, donde se impugna la aprobación de un proyecto y las variaciones a los reglamentos de zonificación, la doctrina generalmente aceptada establece lo siguiente:

> *To be awarded standing to challenge land use actions, associations must be fairly representative of the community, have open membership, have the capacity and authority to*

*maintain judicial actions, and be organized to protect the interest allegedly affected by the land use action.*

P. E. Salkin, <u>American Law of Zoning</u>, Vol. 4, West, 5th Ed., 2009, p.50.

Así pues, concluimos que la Fundación y sus miembros no tienen legitimación activa para presentar el recurso de revisión judicial al amparo de la Sección 4.2 de la L.P.A.U., <u>supra</u>.

## IV

Por todo lo anterior, se modifica el dictamen del Tribunal de Apelaciones, Región Judicial de Aguadilla. En su lugar, se desestima el recurso de revisión judicial por falta de justiciabilidad debido a la ausencia de legitimación activa de los peticionarios para instar el recurso ante el foro apelativo intermedio.

Se dictará sentencia de conformidad.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Fundación Surfrider, Inc., Capítulo de Rincón; León J. Richter

      Peticionarios

           v.

Administración de Reglamentos permisos; Jennymar Corporation

      Recurridos

CC-2005-732

SENTENCIA

En San Juan, Puerto Rico, a 17 de marzo de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se modifica el dictamen del Tribunal de Apelaciones, Región Judicial de Aguadilla. En su lugar, se desestima el recurso de revisión judicial por falta de justiciabilidad debido a la ausencia de legitimación activa de los peticionarios para instar el recurso ante el foro apelativo intermedio.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Fiol Matta disiente con opinión escrita a la cual se unen el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Fundación Surfrider, Inc., Capítulo de Rincón; Leon J. Richter<br><br>Peticionarios<br><br>v.<br><br>Administración de Reglamentos y Permisos; Jennymar Corporation<br>Recurridos | CC-2005-732 | *Certiorari* |

Opinión disidente emitida por la Jueza Asociada señora Fiol Matta a la cual se unen el Juez Presidente señor Hernández Denton y la Jueza Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 17 de marzo de 2010.

I

El 1 de julio de 2004, Jennymar Corporation solicitó a la Administración de Reglamentos y Permisos (A.R.P.E.) la concesión de unas variaciones a los requisitos de zonificación para el anteproyecto de un desarrollo tipo "walk-up", Marina Los Sueños, ubicado en un predio del Barrio Ensenada del Municipio de Rincón. El proyecto, con cabida superficial de 2,791.712 metros cuadrados, consistiría de un edificio de cuatro plantas, dividido en 24 apartamentos de dos habitaciones para servir como residencias de veraneo o "second homes". El anteproyecto original se había presentado el 16 de junio de 2004 y la solicitud de servicios, el 18 de junio del mismo año. El

proponente solicitó variar los siguientes requisitos de zonificación del distrito RT-0 que afectan el predio en controversia:[3] (1) la altura máxima de nueve metros y dos plantas a 10.36 metros y cuatro plantas; (2) el área bruta de piso de un máximo de 40% a 98.49%, y (3) la densidad poblacional de 700 metros cuadrados por unidad de vivienda, equivalente a 4 unidades de vivienda de acuerdo a la cabida del solar, a 147 metros cuadrados por unidad de vivienda, equivalente a 15.2 unidades de vivienda.[4]

---

[3] El colindante derecho también ubica en un distrito RT-0, mientras que el colindante izquierdo, delantero y posterior están calificados como "público". El anteproyecto sometido ante ARPE también solicitaba una variación al requisito de la Sección 66.09 del Reglamento de Planificación Núm. 4 sobre la separación entre el edificio y los estacionamientos de casas de apartamentos, particularmente, variar la distancia de un mínimo de tres metros a 1.2 metros. No obstante, esto no surge del memorial explicativo de 1 de julio de 2004 ni de la autorización de ARPE del 13 de enero de 2005.

[4] El Reglamento de Planificación Núm. 4 utiliza el concepto de una unidad de vivienda básica en el contexto de las casas de apartamentos "para obtener un nuevo cálculo para la densidad permitida en un solar a base del número de habitaciones de cada unidad de vivienda. Una unidad de vivienda básica se compone de una vivienda de tres (3) dormitorios." Sección 2.00 del Reglamento, Reglamento Núm. 6211 de 5 de octubre de 2000, pág. 24. Por esta razón, la sección 66.03 del Reglamento dispone que un apartamento de dos habitaciones equivale a 0.8 unidad de vivienda y que la densidad poblacional no debe exceder de 700 metros cuadrados por unidad de vivienda. Íd., págs. 238-239. Por lo tanto, en el caso ante nuestra consideración, el proyecto propone ubicar 19.2 unidades de vivienda básica (24 apartamentos de 0.8 unidades) cuando el reglamento permite solamente cuatro unidades de vivienda en un solar de 2791.712 metros cuadrados.

A.R.P.E. decidió celebrar vistas públicas y en el Memorial Explicativo correspondiente anunció la presentación de un anteproyecto para el cual se solicitaba la concesión de una "variación en uso". El proponente justificó las variaciones solicitadas aduciendo que por "el alto costo de estos terrenos vacantes" en el sector, la aplicación literal y limitada de los requerimientos del reglamento de zonificación de un distrito RT-0 resultaría en una confiscación del disfrute de la propiedad. En otras palabras, arguyó que edificar un edificio unifamiliar no le permite maximizar su derecho de propiedad, por lo cual alegó que debe autorizarse un desarrollo de densidad media.[5]

A la vista pública comparecieron el Arq. Noel E. Añeses y los abogados de la parte proponente. Varios vecinos comparecieron para oponerse al proyecto, entre éstos, el Sr. Leon J. Richter. También compareció la Fundación Surfrider Inc., capítulo de Rincón. A nombre de la Fundación y del señor Richter, miembro de la misma, compareció el Lcdo. Miguel Sarriera Román. Éste declaró que el área donde se construiría el proyecto sufre de un problema grave de deficiencia en el abasto de agua y que en ocasiones los residentes no han tenido el servicio de agua hasta por cinco días. Este problema se agravaría de aprobarse el proyecto sin mejoras en la infraestructura.

---

[5] Apéndice del peticionario, pág. 62.

Alegó que los intereses de los peticionarios se verían afectados, ya que el desarrollo propuesto aumentaría la densidad poblacional, el ruido y el movimiento vehicular, rompiendo así la armonía y las características del vecindario. Finalmente, arguyó que el proponente no había presentado evidencia alguna que demostrara que la aplicación del reglamento de zonificación podría ser confiscatoria, por lo cual la agencia debía denegar las variaciones como cuestión de derecho.

Tres días más tarde, el oficial examinador rindió su informe y recomendó favorablemente el proyecto propuesto. A.R.P.E. acogió dicha recomendación y aprobó el proyecto el 13 de enero de 2005. Posteriormente, la agencia denegó la reconsideración solicitada por la Fundación Surfrider, Inc., Capítulo de Rincón, y los peticionarios acudieron al Tribunal de Apelaciones.

Ante ese foro alegaron, en primer lugar, que A.R.P.E. no tenía jurisdicción, conforme al Reglamento de Planificación Núm. 4, para aprobar un anteproyecto para casas de apartamentos en un distrito RT-0. Además, arguyeron que la aprobación de las variaciones solicitadas era ilegal, puesto que su efecto es una rezonificación *de facto* del predio, para lo cual A.R.P.E. no tiene facultad, por haberse delegado dicha facultad estrictamente a la Junta de Planificación. En la alternativa, alegaron que las variaciones que la agencia concedió en este caso particular no se justificaron

conforme a derecho. Luego de varios trámites procesales, el Tribunal de Apelaciones confirmó la decisión de A.R.P.E. mediante sentencia dictada el 8 de junio de 2005.

Ante nosotros, la Fundación Surfrider y el señor Richter alegaron esencialmente los mismos errores. Por su parte, el proponente recurrido reiteró los argumentos presentados ante el Tribunal de Apelaciones y solicitó la desestimación del recurso alegando que ni el foro apelativo ni este Tribunal Supremo teníamos jurisdicción para atender la solicitud de los peticionarios porque éstos no tenían legitimación activa. Sobre la Fundación Surfrider, Inc., adujo que el que ésta sea una corporación sin fines de lucro inscrita en el Departamento de Estado y dedicada a promover la protección y el disfrute de los océanos, las playas y sus accesos, no es suficiente, de por sí, para reconocerle legitimación activa porque, según expuso, "nuestro proyecto no colinda con la playa" y la fundación no posee propiedad cerca del predio objeto de controversia.[6] Además, argumentó que "el mero hecho de mencionar que el señor Richter vive en el Barrio Ensenada, cerca de nuestro proyecto, no es suficiente para establecer el grado de afectación de sus intereses personales".[7]

---

[6] Oposición a petición de *certiorari*, pág. 2.

[7] Íd., pág. 3.

Aunque el Tribunal de Apelaciones no discutió estos señalamientos jurisdiccionales, afirmó en su sentencia que coincidía con la alegación de que "los recurrentes no presentaron prueba 'de en qué manera sus intereses quedaron afectados en este proyecto'". No obstante, el foro apelativo no desestimó el recurso, sino que procedió a resolver el asunto en los méritos y confirmó la determinación de la agencia.

La Opinión que hoy emite este Tribunal acoge los planteamientos del proponente y resuelve que los peticionarios carecen de legitimación activa para recurrir de la resolución de A.R.P.E. porque no demostraron el grado de afectación necesario para ser considerados como "parte" en el litigio, bajo la modalidad del participante activo. Consecuentemente, la mayoría desestima el recurso de los peticionarios. Como no coincido con esta apreciación, disiento.


II

La opinión mayoritaria sostiene que al no especificarse cuán cerca está la residencia del Sr. Richter del proyecto, su testimonio sobre la insuficiencia de agua en el sector y el efecto negativo que tendría la construcción del proyecto propuesto en su vecindario es una mera alegación generalizada de que sufriría un daño. Además, la mayoría concluye que no es

suficiente la alegación de que se es vecino de un proyecto para demostrar que se tiene legitimación activa.

Ciertamente, hemos reconocido en otras ocasiones que no todo participante en un procedimiento administrativo puede adquirir la condición de parte. Particularmente, en Rivera v. Morales, 149 D.P.R. 672 (1999), señalamos que la notificación de un aviso de vista pública a los vecinos de un proyecto, en cumplimiento de un requisito reglamentario, no les confiere a éstos, sin más, el derecho a ser reconocidos como parte en el proceso que se lleve a cabo en la agencia. Tomando en cuenta que la sección 3.5 de la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. sec. 2155, permite a una persona con "interés legítimo" intervenir o participar en los procesos adjudicativos de las agencias administrativas, resolvimos, en Lugo Rodríguez v. Junta de Planificación, 150 D.P.R. 29, 43-44 (2000), que para fines de la L.P.A.U. son parte, no solamente el promovente, el promovido y el que haya solicitado formalmente intervenir en el proceso, sino también la persona que haya participado activamente en las vistas públicas y cuyos derechos se verían afectados por la decisión de la agencia de tal manera que "resultaría injusto y arbitrario no considerarlo una 'parte'". Además, en Comisión de Ciudadanos al Rescate de Caimito v. G.P. Real Property S.E., 2008 T.S.P.R. 105, examinamos la distinción entre la comparecencia del "mero

participante" y la intervención del "participante activo", quien comparece para proteger sus derechos de una manera activa, aunque no haya solicitado intervenir formalmente, de tal manera que se convierte en parte.

Podemos reconocer un ejemplo del mero participante – el que no demuestra interés ulterior en el asunto, suple únicamente evidencia documental o comparece como amigo de la corte– en Rivera v. Morales, supra. En ese caso explicamos que las agencias consultadas por la Junta de Planificación para resolver una consulta de ubicación no eran partes, por la naturaleza de su participación, ya que ésta "consiste más bien en ilustrar a la Junta, en ayudarla a llevar a cabo su función de evaluar las consultas de ubicación y considerar la conveniencia o los perjuicios de los proyectos propuestos". Íd., pág. 685. También, determinamos que no es necesario que se haya solicitado intervención formalmente para ser considerado "parte" en un proceso adjudicativo, sino que lo esencial es analizar la naturaleza del interés del participante y de su intervención ante la agencia. Véase también, Junta de Directores v. P.D.C.M., 2008 T.S.P.R. 54, en el que resolvimos que la notificación de la resolución emitida no convierte automáticamente a la persona así notificada en parte en el procedimiento.

En fin, coincido con la mayoría en que ser vecino no necesariamente es suficiente para justificar la intervención de un participante en calidad de parte,

puesto que, según la normativa elaborada en Rivera v. Morales, supra, y establecida formalmente en Lugo Rodríguez v. Junta de Planificación, supra, es necesario que se demuestre un interés particular y una participación más plena en aras de proteger dichos intereses.

Lo que sucede es que en el presente caso los hechos demuestran que el Sr. Richter no es un mero participante, sino todo lo contrario. El Sr. Richter no basó su interés exclusivamente en el hecho de ser vecino del proyecto. Su oposición se fundamentó en las consecuencias particulares que resultarían de la construcción del proyecto y las lesiones particularizadas que él sufriría de llevarse a cabo dicho proyecto en el lugar propuesto. El Sr. Richter compareció a las vistas públicas y sometió una ponencia escrita dirigida a proteger su derecho a conservar su calidad de vida y la naturaleza del vecindario. Ello, no sólo en respuesta a su deber de ciudadano sino, además, como vecino del proyecto interesado en preservar las cualidades de su comunidad. Evidentemente, el Sr. Richter no fue un mero participante, toda vez que basó su comparecencia en un interés legítimo en el asunto objeto de adjudicación y no se limitó a suplir evidencia documental o actuar como amigo de la corte.

Si bien es cierto que el expediente no dice específicamente dónde reside el Sr. Richter con relación

al proyecto, igualmente es cierto que el proponente, quien impugna la legitimación de los peticionarios para presentar este recurso, no refuta la cualidad de vecino alegada por él. Realmente, no hay razón para dudar de que el Sr. Richter es verdaderamente vecino del lugar. Surge del escueto informe de la vista pública que el oficial examinador reconoció que el Sr. Richter compareció en dicha calidad y así se hace constar en la autorización del anteproyecto, que fue notificada por A.R.P.E. al abogado de los peticionarios. A fin de cuentas, nadie cuestionó que el Sr. Richter fuera un vecino del área impactada por el proyecto. No obstante, la mayoría está convencida de que, como no surge del expediente el lugar exacto de la residencia del Sr. Richter con relación al proyecto, su alegación de ser vecino es insuficiente a efectos de determinar los intereses afectados.

Sin embargo, ¿de qué nos sirve saber el lugar exacto de la residencia del Sr. Richter si nadie puso en duda su condición de vecino del lugar del proyecto? ¿Para corroborar si el daño que alega sufrir es cierto? ¿Y si hubiéramos conocido el lugar exacto, de qué manera podría este Tribunal confirmar los daños sufridos por el Sr. Richter? ¿Cuán lejos es lejos para efectos de demostrar que los abastos de agua se verían afectados? No podemos exigir prueba pericial sobre esto para el propósito de evaluar la legitimación activa. ¿Y cuán cerca tiene que

estar la residencia del Sr. Richter del proyecto, para poder alegar a satisfacción de este Tribunal que el valor estético de su vecindario se afectaría, o que se afectaría el patrón del tráfico y la naturaleza de su vecindario por el aumento en la densidad poblacional?

Ciertamente, el grado de especificidad que la mayoría requiere para que un participante pueda demostrar el interés que busca proteger con su participación me parece excesivo. No coincido con la apreciación de que el testimonio del Sr. Richter –consistente en que por ser vecino se vería afectado por la obra, específicamente, en lo que se refiere a los abastos de agua y el valor estético y ambiental de su comunidad– constituye una mera alegación generalizada que no es suficiente para mostrar la lesión particularizada que sufriría. Ahora bien, si la mayoría no está convencida de la naturaleza de la participación del Sr. Richter y entiende que no tiene la información en el expediente para determinarla, lo procedente sería devolver el caso a la agencia para que emita una resolución en cuanto a esto. De esta manera los tribunales podrían estar en posición de revisar esta determinación, como lo hemos hecho en otras ocasiones. Véase, Junta de Directores v. P.D.C.M., supra. La desestimación del recurso, sobretodo en esta etapa de los procedimientos, es una grave injusticia.

Por otro lado, la opinión mayoritaria asevera que el grado de afectación que debe probarse para reconocerle

legitimación al promovente de una acción justiciable en nuestros tribunales, debe ser idéntico al que se ha requerido en la jurisprudencia del Tribunal Supremo federal.   Con ello, deshace más de medio siglo de desarrollo jurisprudencial sobre la legitimación activa de los ciudadanos para cuestionar acciones administrativas.

Explica la Opinión que la base del cambio de enfoque doctrinal reside en que nuestra Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) se inspiró en la *Administrative Procedure Act* (APA) y el *Model State Administrative Procedure Act* (MSAPA).[8]   Según la Opinión, esto conlleva que al aprobar nuestra ley se haya incorporado también la jurisprudencia que interpreta la norma federal.   El fundamento para esta conclusión es la regla de hermenéutica según la cual, cuando se adopta una disposición de ley que proviene de otra jurisdicción se presume que se adoptó también la interpretación de esa ley en su lugar de origen.[9]   Véase, Pueblo v. Matos, 83 D.P.R. 335 (1961), Lagarreta v. Tesorero, 55 D.P.R. 22 (1939), Pueblo v. Ramos, 18 D.P.R. 993, 1001 (1912), Pueblo v. Colón, 15 D.P.R. 680 (1909), Pueblo v. Puente,

---

[8] Informe Conjunto de las Comisiones de Gobierno Estatal, Asuntos Municipales de lo Jurídico sobre el P. del S. 350, abril de 1987, Pagán Ramos v. F.S.E., 129 D.P.R. 888, 898 (1992).

[9] Sin embargo, cuando la interpretación del tribunal del estado sea posterior a la adopción del estatuto en Puerto Rico, la misma sólo tendrá valor persuasivo en nuestra
(continúa...)

14 D.P.R. 111 (1908). Acto seguido, el razonamiento jurídico mayoritario se dirige inexorablemente hacia la jurisprudencia federal, cuya interpretación de la legitimación es mucho más restrictiva que la nuestra. Con ello, el Tribunal retrocede, no sólo en la disposición normativa sobre legitimación, sino en el rango que otorga a unas reglas que, más que normas, son guías para la interpretación. Esa ha sido la función de la "norma de hermenéutica" a la que responde la opinión mayoritaria, desde que se mencionó por primera vez, en 1904.[10] Llamo la atención entonces a que, aun cuando la opinión mayoritaria reconoce que esta regla de hermenéutica es una regla general que está sujeta a muchas excepciones y limitaciones, no menciona que en Pueblo v. Matos, supra, a la pág. 341, rehusamos aplicarla porque nuestra función no es aplicar una regla de hermenéutica, sino adoptar la interpretación "más

jurisdicción. Pueblo v. Cirino, 69 D.P.R. 525, 529 (1949).

[10] En Pueblo v. Rivera (a) Panchito, 7 D.P.R 332 (1904) el Juez Asociado MacLeary señaló que "[e]s un principio bien establecido, tanto en la ley [a]mericana como en la [e]spañola que cuando un Estado adopta una ley de otro, la interpretación que los tribunales de éste último estado hayan dado á [sic] dicha ley merece gran consideración en la interpretación… presumiéndose que la Legislatura al adoptar el texto de la citada ley tenía la intención de que había de darse tal interpretación… Nosotros estamos ciertamente autorizados para seguir las numerosas y altamente respetables autoridades citadas en la presente, especialmente cuando el razonamiento es tan sano y convincente…" a la pág. 353. Cabe señalar que la referencia a la "ley española" no sólo es equivocada, sino contraria a los principios sobre las fuentes de derecho del Derecho Civil.

(continúa...)

justa y razonable." Véase también, <u>Pueblo v. Pacheco Asencio</u>, 83 D.P.R. 526, 531 (1961), resuelto ese mismo año.[11] Además, en este caso no procede aplicar la norma general de interpretación a la que se refiere la opinión mayoritaria.

Primeramente, nuestra disposición sobre la revisión judicial, o sea, la Sección 4.2 de la L.P.A.U., <u>3 L.P.R.A. sec. 2172</u>, no proviene de la APA federal, sino del MSAPA de 1981. Esto no quiere decir que nuestra ley sea un calco o una copia exacta de dicho modelo,[12] más

---

[11] Sabemos que recurrir a las soluciones jurídicas adoptadas por otras jurisdicciones puede ser necesario y que muchas veces enriquece nuestro Derecho, sobretodo cuando nuestro ordenamiento no propone una solución adecuada a una controversia o sufre de alguna laguna jurídica. Véase, por ejemplo, <u>Dávila Vega v. Agrait Vda. de Dávila</u>, 116 D.P.R. 549 (1985). Sin embargo, cuando ese no es el caso, el trasplante de conceptos jurídicos puede ser más bien una fuente de confusión y discordia. Lo mismo es cierto cuando se toma prestada toda una normativa de otra jurisdicción por la sola razón de que es el lugar de origen de la figura que debe interpretarse, ya que con ello se prescinde de un proceso continuo de adaptación e interpretación a la luz del derecho receptor. Por ende, si el préstamo jurídico, sea sustantivo o procesal, no se fundamenta en la ponderación de los méritos de la acción judicial, y de su proyección en el futuro, el mismo puede tener un efecto perjudicial en nuestro ordenamiento jurídico y, por tanto, en la sana administración de la justicia. Véase, Liana Fiol Matta, <u>Interacción del Derecho Común Anglo-americano ("Common Law") y el Derecho Civil</u>, 57 Rev. Col. Abog. 171, 179 (1996): "[C]uando se adopta una figura jurídica y se pretende adoptar, además, la interpretación que a éste se da en el sistema originario –como sucedió en Puerto Rico con la nefasta teoría de que un estatuto se adopta con la interpretación brindada en su lugar de origen– se subvierte el orden formal de las fuentes y se sustituyen los métodos de interpretación propios del sistema."

[12] "Today, more than half of the states have an administrative procedure act **based, at least in part**, on

(continúa...)

bien, nuestra L.P.A.U. fue **basada e inspirada en el MSAPA.** Uno de los elementos autóctonos que distinguen nuestra ley de sus modelos es, precisamente, el amplio marco de legitimación adoptado.  Por otra parte, no debemos olvidar que el MSAPA no es más que lo que indica su título, un modelo a considerarse en la promulgación de legislación administrativa uniforme para cada estado.[13] Por ende, una Ley de Procedimiento Administrativo Uniforme puede ser aún más amplia que lo que provee el modelo, como es nuestro caso.  Nuestra ley sólo requiere, para admitir la intervención en un proceso administrativo, que se demuestre un interés "que pueda ser afectado <u>adversamente</u>", mientras la MSAPA propone un interés que pueda ser afectado <u>sustancialmente</u>.  Más aun, según la L.P.A.U. la agencia viene obligada a aplicar los criterios para conceder la intervención "de forma liberal."[14]   Este Tribunal ha desarrollado toda una

---

either the original Model Act or its 1961 revision… **In the last twenty years there has also been a great deal of experience with the provisions of the Model Act as enacted in the several states, and also a great deal of state legislative experimentation with additional or different administrative procedure requirements."** (Énfasis nuestro), Prefatory Note, Model State Administrative Procedure Act of 1981, 15 U.L.A., pág. 2.

[13]  A saber, se desprende de una somera lectura que ambas leyes emplean, con ciertas variaciones menores, la siguiente organización estructural: a.) Disposiciones Generales, b.) Procedimiento para la Reglamentación, c.) Procedimientos Adjudicativos, y d.) Revisión Judicial.

[14]  La disposición modelo reza: "The presiding officer shall grant a petition for intervention if… the petition states facts demonstrating that the petitioner's legal rights, duties, privileges, immunities, or other legal
(continúa...)

normativa sobre la legitimación basada en el interés "adversamente afectado" y ha cristalizado a través de los años la gran importancia que tiene en nuestro ordenamiento el garantizarle el acceso a los tribunales a los ciudadanos que procuran la revisión judicial de una determinación administrativa. Claramente, en el caso ante nuestra consideración la L.P.A.U. provee legitimación estatutaria a los demandantes; y por tanto, no es necesario obviar nuestra disposición en aras de imponer los requisitos más restrictivos del *standing* constitucional federal.

En segundo lugar, aunque nuestra jurisprudencia no deja expresamente plasmadas cuáles son las "muchas excepciones y limitaciones" que deben servir de contrapeso a la regla de interpretación utilizada por la

---

interests may be **substantially affected** by the proceeding…" (Énfasis nuestro). Sec. 4-209(a)(2), Model State Administrative Procedures Act of 1981, 15 U.L.A. 87.

Sin embargo, la disposición análoga en nuestra L.P.A.U. dispone como requisito para solicitar la intervención que sea "[c]ualquier persona que tenga un **interés legítimo** en un procedimiento adjudicativo ante una agencia…" (Énfasis nuestro). Sec. 3.5 L.P.A.U., 3 L.P.R.A. sec. 2155. Esta diferencia en el grado de afectación se ve aún más marcada cuando la misma disposición desglosa siete factores que tomará en consideración la agencia para considerar si deniega o concede la intervención. Entre éstos se encuentra: "(a) Que **el interés del peticionario pueda ser afectado adversamente** por el procedimiento adjudicativo." (Énfasis nuestro). *Íd*. Posteriormente en la misma disposición se da como directriz: "**La agencia deberá aplicar los criterios que anteceden de forma liberal** y podrá requerir que se le someta evidencia adicional para poder emitir la determinación correspondiente con respecto a la solicitud de intervención." (Énfasis nuestro). *Íd.*

mayoría, no hay duda que cuando su aplicación contraviene todo un cuerpo robusto de razonamientos e interpretaciones jurídicas propias, nos hemos topado con una de estas excepciones.

La tendencia del Tribunal Supremo federal en cuanto a la legitimación cuando se dilucidan asuntos de alto interés público, como son, sin duda, los relacionados a nuestra política constitucional ambiental, contrasta fuertemente con la nuestra.[15]   El profesor Luis E. Rodriguez lo explica así:

Los demandantes en acciones bajo N.E.P.A. tienen que demostrar un daño real (injury in fact), y que están dentro de la zona de interés protegido por la legislación que alegadamente fue incumplida por la agencia gubernamental. Este daño real a su vez requiere un nexo causal entre la acción gubernamental que presuntamente incumple con N.E.P.A. y un daño al ambiente que afecta el disfrute por el demandante de ese ambiente en particular. No obstante, en Salas Soler, nuestro Supremo advirtió que la Ley 9 [Ley sobre Política Pública Ambiental] va [sic] más amplia que N.E.P.A. en esta área toda vez que provee "expresamente para el ejercicio en determinadas circunstancias de una acción pública, limitada al mandamus, por ciudadanos privados". […] Por consiguiente, podemos concluir que **Salas Soler estableció que la Ley 9 permite una aplicación liberal de los requisitos necesarios bajo la doctrina de legitimación activa aun cuando se aplique restrictivamente bajo N.E.P.A.** (Énfasis nuestro y escolios omitidos.) Luis E. Rodríguez, Derecho Ambiental, 67 Rev. Jur. U.P.R. 907, 911-912 (1998).

Ciertamente, el National Environmental Policy Act (NEPA) fue el modelo utilizado en la elaboración de nuestra Ley sobre Política Pública Ambiental, pero

---

[15] Véase como ejemplo las decisiones del Tribunal Supremo federal en Lujan v. Defenders of Wildlife, 504 US 555 (1992), Lujan v. National Wildlife Federation, 497 US 871 (1990), United States v. Students Challenging Regulatory Agency Procedures (SCRAP I), 412 US 669 (1973), y Sierra Club v. Morton, supra.

(continúa...)

nuevamente, nuestra ley no es meramente un calco de las disposiciones federales.[16] Una de las disposiciones más importantes que distinguen nuestra ley de la NEPA es la que expresamente concede legitimación activa para hacer cumplir la ley a cualquier persona natural o jurídica afectada por la falta de implantación de la misma. Véase, Art. 19 de la Ley sobre Política Pública Ambiental, Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. sec. 8002m); Art. 20 de la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. § 1139 (2003). En Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 726 (1974), determinamos que la capacidad para incoar un pleito para asegurar el cumplimiento de la Ley sobre Política Pública Ambiental responde al claro deber público que la misma ley impone. Basamos parte del análisis en nuestras opiniones en Cerames Vivas v. Srio. de Salud, 99 D.P.R. 45 (1970), y

---

[16] Por eso, la interpretación de esta ley federal puede ser persuasiva al momento de interpretar la nuestra, pero no debemos recurrir indiscriminadamente a la jurisprudencia que la interpreta, ya que no todas disposiciones de nuestro estatuto parten de los mismos principios. Por ejemplo, la declaración de política pública contenida en nuestra ley no es meramente estatutaria, sino de rango constitucional. Véase, 1 L.P.R.A. Const. E.L.A. Art. VI Sec. 19. Por la naturaleza constitucional del mandato de protección de nuestros recursos naturales, la Asamblea Legislativa, con el objetivo de establecer unas pautas para guiar la implantación de la sección 19, aprobó nuestra primera Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970. 12 L.P.R.A. §§ 1121 *et seq*, véase, Mun. de San Juan v. J.C.A., 149 D.P.R. 260, 277 (1999); Misión Ind. P.R. v. J.C.A., supra, pág. 920; Salas Soler v. Srio. de Agricultura, *supra*, pág. 723.

Asociación de Maestros v. Pérez, 67 D.P.R. 849 (1947). En éstas explicamos que, cuando se trata de cuestiones de interés público, el pueblo se considera como parte especialmente interesada y no es necesario que el ciudadano demuestre que tiene un interés especial en el resultado del caso para poder presentar un recurso de *mandamus*. Particularmente, en Asociación de Maestros v. Pérez, supra, resolvimos que para ello "[b]asta que es un ciudadano y como tal está interesado en la ejecución y protección del derecho público". Íd., pág. 851.

Cuando el interés del ciudadano parte de la protección y ejecución de una política pública, hemos requerido, como requisito de toda acción legitimada, que se demuestre que el incumplimiento alegado le causa cierto grado de afectación; pero la afectación requerida no se limita al daño económico y la legitimación puede surgir de consideraciones ambientales, recreativas, espirituales o estéticas. Salas Soler v. Srio. de Agricultura, supra, pág. 723. *Cf.* Fundación Arqueológica v. Depto. de Vivienda, 109 D.P.R. 387 (1980). Nuevamente, señalamos en Misión Industrial v. J.P., 146 D.P.R. 64, 174, nota 70 (1998):

> La suficiencia de este interés para conferirle legitimación activa a la parte peticionaria está plenamente justificada cuando se trata de un recurso de *mandamus* para solicitar el cumplimiento de alguna disposición de ley sobre Política Pública Ambiental, debido al origen constitucional de la política pública enunciada en esta legislación.

Este análisis no se ha aplicado únicamente al recurso de *mandamus*. También hemos reconocido la validez y procedencia del recurso de *injunction* para que un ciudadano pueda hacer valer la Ley de Política Pública Ambiental. Mun. de Loíza v. Sucns. Suárez *et al.*, 154 D.P.R. 333, 352, 368-369 (2001); Colón y otros v. J.C.A., 148 D.P.R. 434, 452 (1998); Misión Ind. v. J.P. y A.A.A. 142 D.P.R. 656, 682 (1997). En fin, fundamentándonos en Salas Soler v. Srio de Agricultura, supra, y Asociación de Maestros v. Pérez, supra, desde hace más de sesenta años hemos ido desarrollando una doctrina propia sobre la capacidad de personas y grupos para demandar a las agencias y los funcionarios de gobierno, con una interpretación amplia y liberal de tal concepto. Solís v. Municipio de Caguas, 120 D.P.R. 53, 56 (1987), y P.S.P. v. E.L.A., 107 D.P.R. 590, 595 (1978).

Recordemos, como señala el profesor Villaronga, que "la doctrina de legitimación, así como otras normas que rigen la justiciabilidad, **es un asunto de derecho puertorriqueño**". L. M. Villaronga, Derecho Constitucional, 62 Rev. Jur. U.P.R. 683, 684 (1993).[17] Además, el profesor hace el siguiente señalamiento:

---

[17] L. M. Villaronga, Derecho Constitucional, 62 Rev. Jur. U.P.R. 683, 684 (1993):
> Así como en el derecho federal, nuestros requisitos de justiciabilidad y de legitimación surgen de las preocupaciones institucionales inherentes al poder judicial de Puerto Rico y al papel que desempeña en nuestro sistema de gobierno. Las decisiones federales, aunque proveen guías útiles a las que nuestro Tribunal

(continúa...)

En el derecho puertorriqueño, y a riesgo de simplificar excesivamente, coexisten dos vertientes de la doctrina de legitimación, las cuales se han desarrollado de forma paralela. Una de ellas, que se asocia con el "familiar modelo de la contienda privada" o "modelo clásico de lo que constituye un 'caso' o 'controversia' ", postula conceptos restrictivos o de autolimitación en el ejercicio del poder de revisión judicial. **La otra vertiente, que se asocia con el modelo de "la acción pública", se aparta de los conceptos de legitimación desarrollados en la jurisprudencia federal, e interpreta amplia y liberalmente la legitimación activa de ciudadanos individuales**. En esta vertiente se encuentran casos en que se admite la legitimación por varias razones: se interpreta de manera liberal el estatuto en que se basa la acción, o no se exige al litigante que demuestre un daño particularizado distinto al del resto de la ciudadanía, o se amplía el concepto de lo que constituye daño, o se considera que se trata de acciones revestidas de un vasto interés público. (Énfasis suplido.) Íd., pág. 684.

Por su parte, el profesor José Julián Álvarez afirma que "[e]n el campo de la justiciabilidad, varias decisiones correctamente se apartan del modelo diseñado para las cortes federales y reconocen 'acciones públicas', sin exigir al litigante que demuestre un daño particularizado, distinto al del resto de la ciudadanía". J.J. Álvarez González, La protección de los derechos humanos en Puerto Rico, 57 Rev. Jur. UPR 133, 169 (1988). Ello no sólo en el contexto de las acciones estatutarias, como serían los casos al amparo de la Ley sobre Política Pública Ambiental que confiere amplia legitimación a los

Supremo frecuentemente se refiere, en última instancia son impertinentes para resolver la cuestión de cuán liberales deben ser las normas

(continúa...)

ciudadanos, sino en otros tipos de acciones públicas, al amparo del interés del ciudadano en que se cumpla la política pública del estado.

En estos temas de legitimación de terceros hemos dado acceso a los tribunales mediante la interpretación abarcadora de las normas de legitimación activa aun cuando la práctica en la jurisdicción federal ha sido lo contrario. En E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 399 (1983), distinguimos entre el "modelo de la contienda privada" y las acciones públicas y precisamos el criterio del daño requerido para justificar la legitimación en ambas situaciones. En ese caso, negamos la aplicación del modelo clásico de caso o controversia para resolver asuntos de legitimación en acciones públicas y reconocimos la capacidad de la Telefónica para defender, a nombre de sus clientes, el derecho a la intimidad. Véase además, Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715 (1980); Rodríguez v. Srio de Instrucción, 109 D.P.R. 251 (1979); P.S.P v. E.L.A., supra.

Por el contrario, quedó resuelto desde Baker v. Carr, 369 US 186 (1962), que la legitimación necesaria para acceder al foro federal, en ausencia de disposición estatutaria, se reconoce sobre la base del interés personal de la parte en el resultado de la controversia y en Sierra Club v. Morton, supra, el Tribunal Supremo federal sostuvo que una organización sólo podría tener

de legitimación de un estado cuando determina
(continúa...)

capacidad para demandar si demuestra que algunos de sus miembros se vería afectado por la medida impugnada. Aclaró que aunque se tratara de una "acción pública", era necesario cumplir con el requisito de que se haya sufrido personalmente un daño o se tenga un interés personal en el resultado.[18]

Es evidente que esta jurisprudencia federal difiere de la que ha desarrollado este Tribunal a través de los años. Nuestra jurisprudencia ha resuelto claramente que, con relación a legitimación de terceros, incluso en las "contiendas privadas", una organización no necesariamente tiene que depender de la legitimación de sus miembros para demostrar que la organización misma tiene un interés legítimo que defender en los tribunales. Véase, Colegio de Ópticos v. Vani Visual, 124 D.P.R. 559 (1989); Solís v. Municipio de Caguas, supra. En fin, en Puerto Rico, una organización puede vindicar los derechos propios de la entidad si demuestra los daños sufridos por la agrupación. No obstante, cuando la legitimación de la organización se basa en los daños sufridos por sus miembros y la acción se lleva en su representación, entonces, hemos recurrido a la interpretación más restrictiva del foro federal. Véase, Colegio de Ópticos v. Vani Visual, supra; Fundación Arqueológica v. Depto.

---

ser generoso.

[18] "But broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." Íd., pág. 738.

(continúa...)

de Vivienda, supra; Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975).[19]

La Fundación Surfrider, Inc., mostró que tiene un interés propio en el resultado de la determinación de la agencia, independiente del interés de sus miembros que comparecieron a las vistas. La Fundación es una organización incorporada al amparo de las leyes del estado de California y debidamente inscrita en el Departamento de Estado. Entre sus propósitos, delimitados en sus artículos de incorporación, se encuentra la protección de las playas, los océanos y sus accesos a través de la conservación, el activismo, la investigación y la educación.[20] Una enmienda a los artículos de incorporación añade, además de los propósitos enumerados anteriormente: "Such other purposes as are reasonably related thereto".

Sabemos que la conservación está íntimamente ligada a la planificación. En este marco, el capítulo de Rincón de la Fundación lleva trabajando activamente desde principios de esta década con asuntos de zonificación y planificación en dicha región relacionados con la creación de la Reserva Marina Tres Palmas. En su página

---

[19] Vale señalar el efecto que puede tener en otros tipos de casos la interpretación que hoy adopta la mayoría. Por ejemplo, la legitimación reconocida a los legisladores en nuestra jurisdicción en ocasiones es más amplia que en el foro federal. Véase, Hernández Agosto v. Romero Barceló, 112 D.P.R. 407 (1982); Fuster v. Busó, 102 D.P.R. 327 (1974), entre otros.

(continúa...)

de internet "Salva Tres Palmas", de la cual se incluyen reproducciones en el expediente, la Fundación expresa su interés particular por preservar los recursos naturales y recreativos de Rincón, amenazados por el desarrollo excesivo del área. Además, la Fundación identificó la necesidad de trabajar para mejorar la zonificación local y la conservación de terrenos en Rincón. Precisamente, éstos son los aspectos que atendió la Fundación, en coalición con otras organizaciones representantes del estilo de "grassroots activism", para finalmente lograr la designación de la Reserva Marina de Tres Palmas.

Para concluir que la Fundación no tiene legitimación no es suficiente expresar que el proyecto no colinda con el mar o que la Fundación tampoco es vecina del proyecto, es decir, que no posee terreno cerca del predio objeto de controversia, sin entrar a discutir la jurisprudencia de este Tribunal en la que hemos reconocido legitimación a organizaciones similares. Aunque se entienda que el grado de afectación de la Fundación no es suficiente con relación al caso particular, la Fundación afirmó que sus miembros comparecientes gozan de legitimación individualmente. Realmente, por una u otra razón, no hay base para cerrar las puertas y negar a los peticionarios el acceso a los tribunales en este caso.[21] El profesor

---

[20] Apéndice del *certiorari*, pág. 8.
[21] En <u>E.L.A. v. P.R. Tel. Co.</u>, supra, a la pág. 399, advertimos lo siguiente: "…tendemos a veces olvidar que, a fin de cuentas, la doctrina de capacidad para demandar [o legitimación activa] es tan solo un mecanismo que los
(continúa...)

Álvarez González correctamente ha señalado que "[e]l concepto de justiciabilidad […] está íntimamente vinculado a la vindicación de los derechos". Álvarez González, supra, pág. 169, nota 210. Los derechos constitucionales realmente existen cuando hay el acceso a la justicia; no por el mero hecho de que se hayan plasmado en la constitución de un país, sino porque a través de los tribunales se asegura al ciudadano el poder vindicarlos.

En la práctica, la vindicación de los derechos ambientales no se da solamente invocando la Ley sobre Política Pública Ambiental en el foro judicial. Podría decirse que la mayor parte de las acciones en protección del ambiente se originan en el ámbito administrativo, instadas por individuos, comunidades y organizaciones ambientales para asegurar la buena planificación urbana.[22] La razón es evidente, pues tanto la política de planificación como la política ambiental reconocen la

___

tribunales utilizan en ocasiones para delimitar su propia jurisdicción, para no adentrarse en los dominios de otras ramas del gobierno, para no lanzarse a resolver cuestiones hipotéticas o planteadas dentro de un contexto inadecuado de hechos[…] Hay que ir, para sopesarlas a plena luz, a las fuerzas subyacentes que motivan en la realidad la abstención o intervención judicial en una situación dada."

[22] Recordemos además nuestras decisiones en Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70 (2000), y Asoc. Res. Park Side, Inc. v. J.P., 149 D.P.R. 300 (1999), en las cuales elaboramos el concepto de ambiente humano o urbano.

importancia del equilibrio sustentable entre la actividad

humana y los sistemas naturales en pro del bienestar

general.[23] Al interpretar las figuras del interventor y de

la   parte   contenidas   en   la   Ley   de   Procedimiento

_____

[23] La   declaración   de   la   Ley   sobre   Política   Pública
Ambiental dispone lo siguiente:

> El  Estado  Libre  Asociado  de  Puerto  Rico,  en
> pleno reconocimiento del profundo impacto de la
> actividad del hombre en las interrelaciones de
> todos  los  componentes  del  medio  ambiente
> natural,  especialmente  **las  profundas
> influencias  del  crecimiento  poblacional,  la
> alta densidad de la urbanización, la expansión
> industrial,  recursos  de  explotación  y  los
> nuevos  y  difundidos  adelantos  tecnológicos** y
> reconociendo, además, la importancia crítica de
> restaurar y mantener la calidad medio ambiental
> para  el  total  **bienestar  y  desarrollo  del
> hombre**,  declara  que  es  política  continua  del
> Gobierno del Estado Libre Asociado, incluyendo
> sus   municipios,   en   cooperación   con   las
> organizaciones  públicas  y  privadas  interesadas,
> el  utilizar  todos  los  medios  y  medidas
> prácticas,   incluyendo   ayuda   técnica   y
> financiera, con **el propósito de alentar y
> promover el bienestar general y asegurar que
> los  sistemas  naturales  estén  saludables  y
> tengan  la  capacidad  de  sostener  la  vida  en
> todas sus formas, así como la actividad social
> y  económica,  en  el  marco  de  una  cultura  de
> sustentabilidad,  para  crear  y  mantener  las
> condiciones  bajo  las  cuales  el  hombre  y  la
> naturaleza puedan existir en armonía productiva
> y  cumplir  con  las  necesidades  sociales  y
> económicas  y  cualesquiera  otras  que  puedan
> surgir con las presentes y futuras generaciones
> de   puertorriqueños.**   (Énfasis   suplido.)
> 12 L.P.R.A. sec. 8001(a).

La  Ley  Orgánica  de  la  Junta  de  Planificación,  por  su
parte,  al  establecer  los  propósitos  de  dicha  agencia,
dispone lo siguiente:

> Los  poderes  concedidos  en  este  subcapítulo  se
> ejercerán  con  el  propósito  general  de  guiar  el
> desarrollo  integral  de  Puerto  Rico  de  modo
> coordinado,  adecuado,  económico,  el  cual,  **de
> acuerdo  con  las  actuales  y  futuras  necesidades
> sociales  y  los  recursos  humanos,  ambientales,
> físicos y económicos,** hubiere de fomentar en la
> mejor  forma  la  salud,  la  seguridad,  el  orden,

(continúa...)

Administrativo Uniforme, la mayoría inserta en el análisis unos criterios sobre legitimación extremadamente restrictivos, producto de su particular visión interpretativa, lo cual tiene el efecto perjudicial de limitar aún más el acceso a los tribunales. **La decisión de la mayoría de este Tribunal desarticula nuestro desarrollo jurisprudencial y niega la legitimación que hemos reconocido a las organizaciones por sus propios daños y a nuestros ciudadanos para llevar acciones públicas a nombre propio o de terceros para vindicar una violación de la política pública por parte del mismo gobierno que tiene el deber de tutelarla.**

Por otro lado, llamamos la atención a que lo resuelto en el caso ante nuestra consideración forma parte de un desarrollo jurisprudencial contrario a la participación ciudadana, que se ha ido gestando en las últimas decisiones de este Tribunal. En <u>Junta v. Cordero Badillo,</u> 2009 T.S.P.R. 160, la opinión mayoritaria resolvió que una "Comparecencia de Interventores" no puso a la agencia administrativa en posición de aceptarla porque, a su juicio, la petición no estaba debidamente

---

la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aquella **eficiencia, economía y bienestar social en el proceso de desarrollo, en la distribución de población, en el uso de las tierras y otros recursos naturales, y en las mejoras públicas que tiendan a crear condiciones favorables para que la sociedad pueda desarrollarse integralmente.** (Énfasis nuestro.) Art. 4 de la

(continúa...)

fundamentada como exige la Sec. 3.5 de la L.P.A.U., supra. Aduciendo la necesidad de modificar la informalidad del proceso ante las agencias, que supuestamente crea confusión, la mayoría en ese caso ignoró la naturaleza flexible de los procedimientos administrativos, en particular la sección 3.5 de la L.P.A.U., que expresamente le requiere a la agencia administrativa interpretar de forma liberal los requisitos, y por ende las solicitudes, para la intervención. Al criticar la trayectoria "liberalizadora" que venía siguiendo este Tribunal, la Opinión en Junta v. Cordero Badillo, supra, hizo énfasis en que, "[l]a liberalización… no equivale… a sancionar la intervención indiscriminada ni a sentar el principio de que toda duda posible debe resolverse a favor de la intervención".[24] La nueva trayectoria de este Tribunal es sumamente preocupante porque se apuntala en la posición diametralmente opuesta a la tal "liberalización", que no pretende otra cosa que garantizarle a los ciudadanos, que presenten un interés legítimo, una oportunidad real de participación e intervención.

El presente caso entrelaza, con resultados devastadores, las figuras claves que garantizan el acceso a los tribunales en casos administrativos, o sea, la

---

Ley Núm. 75 de 24 de junio de 1975, 23 L.P.R.A. sec. 62c.

[24] Junta v. Cordero Badillo, supra, citando a Chase Manhattan Bank v. Nesglo, Inc., 111 D.P.R. 767, 770 (1981).

intervención en el foro administrativo y la revisión judicial. En efecto, el destierro de la figura del "participante activo", en <u>Junta v. Cordero Badillo,</u> supra, sirvió como antesala a la adopción del estándar federal de legitimación que se aplica hoy. Al considerar los nuevos estándares impuestos por este Tribunal, junto a la visión cada vez más estricta de "deferencia sustancial"[25] a la determinación de la agencia administrativa, desembocamos en una claudicación de nuestra función como máximo foro revisor y garante del acceso a los tribunales.

La Opinión en este caso, al igual que en <u>Junta v. Cordero Badillo,</u> supra, menosprecia los reclamos de los ciudadanos afectados. Así, ni problemas relacionados al abasto de agua en un vecindario situado en un área turística, ni el efecto económico de un proyecto que impacta la estabilidad del sector, son suficientes para impugnar una cuarta enmienda a un proyecto dudoso o una rezonificación *de facto* de un predio protegido contra el desarrollo de gran densidad poblacional.

**Lo decidido hoy por este Tribunal es un golpe duro a los ciudadanos dedicados a la protección de sus comunidades y comprometidos con el medioambiente, que**

---

[25] Con relación a la norma de deferencia sustancial, notamos la pérdida u omisión en los casos recientes de una expresión de contrapeso: "cuando la agencia interpreta el estatuto que viene llamado a poner en vigor de forma tal que produce resultados contrarios al propósito de la ley, dicha interpretación no puede
(continúa...)

**abogan por un desarrollo urbano ordenado y coherente con nuestra política pública y sus leyes y reglamentos**. Como no coincido con esta decisión y contrario a la mayoría, no decretaría la desestimación de este recurso, paso a discutir someramente las controversias planteadas en los méritos.

III

El primer señalamiento de error versa sobre la interpretación de la sección 66.01 del Reglamento de Planificación Núm. 4. Al analizarlo, debemos recordar, en primer lugar, que este reglamento aplica tanto a la Junta de Planificación como a A.R.P.E. Precisamente, la creación de la Administración de Reglamentos y Permisos respondió a la necesidad de permitirle a la Junta dedicarse exclusivamente a desarrollar la política pública de planificación. Hatillo Cash & Carry v. A.R.P.E., 2008 T.S.P.R. 97; Luan Investment Corp. v. Román, 125 D.P.R. 533, 548 (1990); E.L.A. v. Domínguez, 104 D.P.R. 468, 470 (1975). En vista de ello, hemos resuelto que la intención del legislador, al reestructurar la agencia en 1975, fue trasladar las fases operacionales de la Junta a A.R.P.E. mediante un nuevo esquema administrativo. Hatillo Cash & Carry v. A.R.P.E., supra; A.R.P.E. v. Rivera, 159 D.P.R. 429, 438 (2003).

La sección 66.01 del Reglamento de Planificación Núm. 4 dispone, como regla general, que la Junta deberá

---

prevalecer". Martínez Segarra v. Rosado Santoni, 2005

(continúa...)

considerar mediante consulta de ubicación los proyectos para las construcciones de casas de apartamentos en los distritos RT-0. No obstante, aunque A.R.P.E. también podrá considerar este tipo de proyecto, sólo podrá ejercer dicha facultad bajo ciertas condiciones restrictivas.[26] El Tribunal de Apelaciones resolvió que dicha sección del reglamento solamente excluye la facultad de A.R.P.E. para atender los proyectos de casas de apartamentos cuando se trate de desarrollos extensos. Sin embargo, la disposición antes citada expresamente le niega a A.R.P.E. la facultad para aprobar un anteproyecto para el desarrollo de un proyecto de casas de apartamentos en un distrito RT-0, **aunque no sea extenso**. El tratarse de un desarrollo extenso es solamente una de las condiciones que la sección establece para limitarle a A.R.P.E. dicha facultad. Así, en los distritos RT-0, A.R.P.E. no tiene facultad para aprobar un proyecto de casas de apartamentos, sea o no un desarrollo extenso; en los demás distritos tendrá dicha facultad cuando no se

---

T.S.P.R. 127.

[26]    En particular, la subsección 66.01 establece lo siguiente:

> La Junta considerará, mediante consulta de ubicación en los distritos RT-0, RT-00, RT-1, R-3 y R-4 proyectos para las construcciones que más adelante se indican. **La Administración de Reglamentos y Permisos podrá considerar estas construcciones siempre que el proyecto <u>no</u> ubique en un distrito** R-1, R-2, RT-00, **RT-0**, RT-1, RT-2 **y <u>no</u> constituya un desarrollo extenso** y sujeto a las condiciones necesarias para asegurar su armonía con el contexto en que ubique… (Énfasis suplido.) Íd., pág. 238.

(continúa...)

trate de desarrollos extensos. No hay duda, pues, que el primer error se cometió. A.R.P.E. simplemente no tiene autoridad para aprobar proyectos de casas de apartamentos en distritos RT-0.

Los peticionarios alegaron, además, que la concesión de las variaciones solicitadas opera como una rezonificación, **facultad que no le fue concedida a A.R.P.E.** Adujeron, específicamente, que las modificaciones a los requisitos de altura, densidad poblacional y área bruta de piso, propios del distrito RT-0, cuya intensidad de desarrollo debe ser muy baja, *de facto* convertirían el predio en un distrito RT-4 de intensidad "semi-alta".

En López v. Junta de Planificación, 80 D.P.R. 646 (1958), discutimos por primera vez la figura de las variaciones. La definición que allí recogimos es cónsona con el concepto plasmado en los reglamentos de la Junta, los cuales se han modificado a través de los años. En particular, resolvimos que "una 'variación' permite un uso que es incompatible con el carácter esencial de una zona o distrito a fin de proteger en circunstancias extraordinarias los derechos constitucionales del propietario".[27] En cuanto al posible efecto confiscatorio que podría significar la imposición de los reglamentos de zonificación, hay que recordar que:

---

[27] López v. Junta de Planificación, supra, a la pág. 654.

El hecho de que la zonificación impida el mejor uso productivo o el uso ideal de un terreno, no implica que éste haya sido privado de todo uso… **Se olvida muy fácilmente… de que el uso ideal proyectado por una entidad privada para un terreno no necesariamente está acorde con la política pública establecida por el Estado".** (Énfasis nuestro.) Opinión concurrente y disidente del Juez Hernández Denton en Culebra Enterprises Corp. v. ELA, 143 D.P.R. 935, 961 y 985 (1997). Véase también, Arenas Procesadas, Inc. v. ELA, 132 D.P.R. 593, 605 y 611 (1993).

Así pues, en Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 80 (2000) resolvimos que no se justifica conceder una variación cuando no se haya establecido que ninguno de los usos permitidos fueran viables y ésta sea innecesariamente gravosa.[28] Esto implica que la concesión de variaciones tiene la finalidad de evitar que los reglamentos de planificación se conviertan en un instrumento inflexible, en detrimento de los derechos constitucionales de las personas, y que su aplicación resulte ser irrazonable. Asoc. Res. Baldrich, Inc. v. J.P. de P.R., 118 D.P.R. 759, 769-770 (1987); López v. Junta de Planificación, supra, pág. 654. Sin embargo, no se trata de aplicar los requisitos para la concesión de variaciones de forma laxa e indiscriminada, puesto que la alteración caso a caso de las características de un distrito que se concibió con cierta infraestructura y para ciertos usos, socava la

---

[28] Véase, Mun. de San Juan v. Bosque Real, S.E., supra, pág. 761; T-JAC, Inc. v. Caguas Centrum Limited, supra, págs. 82-83 (1999); Asoc. Res. Park Side, Inc. v. J.P. I, 139 D.P.R. 349, 356 (1995); Asoc. Res. Baldrich v. J.P. de P.R., 118 D.P.R. 759, 769 (1987).

(continúa...)

política pública de planificación urbana integrada. <u>Mun.
de San Juan v. Bosque Real, S.E.</u>, 158 D.P.R. 743, 763
(2003); <u>Asoc. Res. Park Side, Inc. v. J.P. II</u>, 149 D.P.R.
300, 308 (1999). Cualquiera que sea la variación, "la
densidad o intensidad solicitada" no debe implicar una
rezonificación *de facto*, es decir, "convertir el distrito
en otro". Subsección, 82.05 del Reglamento Núm. 6211,
supra, pág. 287. Véase, Sección 2.00(32) del Reglamento
Núm. 6435, supra, pág. 19.[29]

En cuanto a esto, el tratadista E.C. Yokley explica
que una variación sirve para permitir **desviaciones
mínimas** a las reglamentaciones del uso de los terrenos
para evitar perjuicios innecesariamente gravosos al
propietario **sin menoscabar el esquema global de la
reglamentación**.[30] E.C. Yokley, *op. cit.*, Sec. 20-1, págs.
20-1 y 20-2. Así lo resolvimos en <u>Mun. de San Juan v.</u>

---

[29] Véase, K.H. Young, <u>Anderson's American Law of Zoning,</u>
4ta ed., Vol. 3, 1996, Clark Boardmand Callaghan, New
York, Sec. 20.06, pág. 425: "A 'use' of variance, as the
term implies, is one which permits a use of land other
than those is [sic] prescribed by the zoning regulations.
Thus, a variance which permits… a multiple dwelling in a
district limited to single-family homes… is a use
variance." Véase, además, la discussion de la
jurisprudencia de distintos estados en E.C. Yokley,
<u>Zoning Law and Practice,</u> 4ta ed., Vol. 1, 2008, págs..
20-9 y 20-10.

[30] "It [a variance] has been described as an
administrative or quasi-judicial act permitting minor
deviations from land use regulations and avoiding undue
hardship for the property owner without violating the
overall scheme of land use regulation. It is not a
reclassification of the zoning applicable to a property."
E.C. Yokley, <u>Zoning Law and Practice</u>, 4ta ed., Vol. 1,
2008, Sec. 20-1, págs. 1-2.

Bosque Real, S.E., supra, frente a una solicitud de variación a los requisitos de densidad poblacional.

De forma consecuente, hemos resuelto que si lo que se solicita conlleva un cambio en la zonificación del predio deben cumplirse los requisitos aplicables a una rezonificación, los cuales hemos explicado en varias ocasiones. Véase, Mun. de San Juan v. Bosque Real, S.E., supra, pág. 766; López v. Antonio Roig Sucrs. Inc. 157 D.P.R. 186, 198 (2002); T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 88 (1999); Montoto v. Lorie, 145 D.P.R. 30, 46 (1998).[31] Igualmente consecuentes hemos sido en cuanto a que el "poder de reglamentación sobre zonificación… incluye la rezonificación". Luan Investment Corp. v. Román, supra, pág. 549.[32]

En Montoto v. Lorie, supra, explicamos la figura de la rezonificación y expresamos lo siguiente:

---

[31] Tanto el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 del 13 de octubre de 1999, vigente al momento de los hechos, como el nuevo Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 7629 de 11 de diciembre de 2008, disponen que cuando una consulta de ubicación conlleve alguna variación, se deberá someter, junto a la consulta, una solicitud de variación y se deberán fundamentar las razones que apoyan la solicitud. Igualmente se aplica cuando lo solicitado es una excepción. Véase la subsección 4.01 del Reglamento Núm. 6031, supra, págs. 18-19; Reglamento Núm. 7629, supra, págs. 8-9. Además, la subsección 4.09 establece los requisitos a seguir cuando los cambios de zonificación se solicitan mediante una consulta de ubicación. Reglamento 6211, supra, pág. 50. Véase Subsección 4.11 del Reglamento de Calificación, Reglamento Núm. 7628 de 11 de diciembre de 2008, pág. 36.

(continúa...)

> Nuestra realidad social obliga al Estado a salvaguardar las zonificaciones existentes. Para lograr enmendar y alterar éstas, es necesario que el propósito de la zonificación original del área sea incompatible con el ambiente prevaleciente. De entender la Junta que las circunstancias del área donde ubica el solar que habrá de ser rezonificado han cambiado con el tiempo, ésta puede optar por permitir la enmienda en el mapa de zonificación. De no ser así, la Junta debe mantener la zonificación original. Íd., págs. 43-44.

Por su parte, la Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 1 de julio de 1975, 23 L.P.R.A. sec. 71 et seq., permite conceder variaciones o autorizar excepciones a los requisitos de zonificación establecidos por los reglamentos que administra, sujeto a los mismos criterios que dispone la ley para el ejercicio de esta facultad por la Junta y a las normas adoptadas por la Junta mediante reglamento. En fin, ambas agencias tienen la facultad de dispensar del cumplimiento de los requerimientos propios de los distritos de zonificación, mediante disposiciones separadas y con un lenguaje muy similar.[33]

---

[32] Véase, <u>J.P. v. Frente Unido I</u>, 165 D.P.R. 445, 464 (2005); <u>T-JAC, Inc. v. Caguas Centrum Limited</u>, supra, pág. 83.

[33] El artículo 11(7) de la Ley Orgánica de la Junta de Planificación de Puerto Rico permite:

> **Dispensar el cumplimiento de uno o varios requisitos reglamentarios** con el propósito de lograr la utilización óptima de los terrenos y dirigido hacia el objetivo de poner en práctica el desarrollo urbano compacto; o en los casos en que un uso no permitido, pero compatible con el carácter esencial del distrito, **la aplicación de los requisitos de los reglamentos resulte en la prohibición o restricción**

(continúa...)

Sin embargo, la discreción de A.R.P.E. para otorgar variaciones está limitada a los casos especificados en los reglamentos adoptados por la Junta. En lo que respecta a las normas de zonificación, el propósito de permitir la concesión de variaciones, según el Reglamento de Zonificación, es "evitar que la aplicación literal de los requerimientos de este Reglamento resultare en una confiscación del disfrute de la propiedad". Subsecciones 82.02 y 83.02 del Reglamento de Planificación Núm. 4, supra, págs. 286 y 288. Cuando se demuestre, a satisfacción de la agencia, que la propiedad está particularmente afectada por la reglamentación y resulte "innecesariamente gravosa", la subsección 82.05 del Reglamento de Planificación Núm. 4 establece los parámetros para guiar la discreción de ambas agencias en

---

**irrazonable del disfrute de una pertenencia o propiedad y se le demuestre, a su satisfacción, que dicha dispensa aliviará un perjuicio claramente demostrable, pudiendo imponer las condiciones que el caso amerite para beneficio o protección del interés público.** (Énfasis nuestro), 23 L.P.R.A. sec. 62j(7).

Por su parte, la Ley Orgánica de la Administración de Reglamentos y Permisos dispone que serán deberes y facultades generales del Administrador y de la Administración, en adición a las que le son conferidas por este capítulo, o por otras leyes[,] los siguientes:

(u) **Dispensar el cumplimiento de los requisitos de los Reglamentos de Planificación** de conformidad con lo establecido en los mismos y en este capítulo, **asegurando siempre que dicha facultad no se utilice con el propósito o resultado de obviar las disposiciones reglamentarias vigentes.** (Énfasis nuestro), 23 L.P.R.A. sec. 71d.

la aplicación de los mecanismos de variación. Íd., pág.
287-288.[34] Véase, Empresas Ferrer, Inc. v. A.R.P.E., 2007
T.S.P.R. 175; Mun. de San Juan v. Bosque Real, S.E.,
supra, a la pág. 761; A.R.P.E. v. J.A.C.L., supra, a la
pág. 864. En esa sub-sección, se dispone que se deberán
tomar en consideración los siguientes factores:

    1. …
    2. …
    3. …
    4. **La densidad o intensidad solicitada no lleva
       a convertir el distrito en otro.**
    5. **La variación solicitada es cónsona** con los
       propósitos de la disposición reglamentaria
       que se solicita sea modificada, así como **con
       la política pública**. (Énfasis suplido.) Íd.

Evidentemente, la concesión de las variaciones
solicitadas por el proponente constituye una
rezonificación *de facto*. La sección 33.02 permite la
construcción de edificios de casas individuales y casas
de dos unidades de vivienda en los distritos RT-0.[35]

---

[34] Aunque la subsección 82.05 dispone que solamente la
Junta podrá conceder variaciones, se entiende que
A.R.P.E. también puede, puesto que su ley orgánica le
faculta para ello. Véase, 23 L.P.R.A. sec. 71i. La
Resolución Núm. JPD-11-2002 de la Junta de Planificación,
además, delega en A.R.P.E. la facultad de adjudicar
solicitudes de variaciones en el Reglamento de
Planificación Núm. 4, reconociendo que está dentro de su
ámbito de jurisdicción otorgado por ley.

[35] El Reglamento de Planificación Núm. 4 define el
concepto de "unidad de vivienda" de la manera siguiente:
"Edificio o aquella parte del mismo que se utiliza para
el alojamiento de una familia". Sección 2.00 del
Reglamento Núm. 6211, supra, pág. 24. A su vez, define
"casa de dos familias" y permite que se den "una sobre la
otra". Íd., pág. 9. Ya que la sección 33.00, referente al
distrito RT-0, no utiliza un concepto específico para
describir el tipo de edificio que se pueda construir para
alojar a dos familias, podemos concluir que la altura
máxima de plantas en un distrito RT-0 es de dos plantas.

Además, las secciones 33.03 y 66.02 del Reglamento de Planificación Núm. 4 aclara que en los distritos RT-0, la altura no deberá exceder de nueve metros Por otro lado, la sección 38.03 dispone que "[l]os edificios para uso residencial [en distritos RT-4] podrán tener hasta cuatro (4) plantas de altura". En este caso, se solicitó una variación de dos plantas y 1.36 metros, lo cual conformaría las estructuras a los requerimientos de altura del distrito RT-4.

De la misma manera, en cuanto a la densidad poblacional permitida para las construcciones de casas de apartamentos en distritos RT-0, la sección 66.03 dispone que en solares cuya área sea mayor de 2000 metros cuadrados, la densidad debe ser de 700 metros cuadrados por unidad de vivienda. La variación solicitada pedía desarrollar el predio para aumentar la densidad poblacional a 147 metros cuadrados por unidad de vivienda. Esto es equivalente a lo permitido para los distritos RT-3.[36]

En cuanto al área bruta de piso, la sección 66.05 del reglamento permite ocupar un máximo de 40% del área del solar en aquellos solares mayores de 2000 metros cuadrados en los distritos RT-0. La variación solicitada

---

[36] Así lo dispone la sección 37.05 del Reglamento: "En proyectos de casas de dos familias y casas de apartamentos se permitirá una densidad de ciento cincuenta (150) metros cuadrados por unidad de vivienda básica." Reglamento de Planificación Núm. 4, supra, pág. 163.

buscaba aumentar el área bruta a un 98.49%, equivalente a lo permitido en los distritos RT-3. La sección 37.07 del reglamento establece que en los distritos RT-3, el área bruta "no excederá el cien por ciento (100%) del área del solar." Íd., pág. 164.

Por otro lado, la Resolución Núm. 2000-011-JP-ZIT, emitida por la Junta el 16 de enero de 2001, adoptó para los municipios de Rincón y Añasco, la delimitación y designación de ciertas áreas como zonas de interés turístico.[37] El propósito de la designación de una zona de interés turístico es identificar un área que debe ordenarse de tal manera que se fomente el desarrollo del turismo y se proteja el valor particular del lugar. Esta Resolución adoptó, además, los mapas de zona de interés turístico correspondientes a dichos municipios. De esta manera, la finca en controversia se ubicó en un distrito RT-0, cuyo propósito es:

> promover el desarrollo ordenado y estético y para clasificar terrenos en las Zonas de Interés Turístico, normalmente en la periferia de áreas desarrolladas o con algunas limitaciones a su utilización, que se han desarrollado o podrían desarrollarse **a una muy baja intensidad**. (Énfasis suplido.) Subsección

---

[37] En dicha resolución, la Junta expuso que en "la Región Oeste esta Zona de Interés Turístico responde a la política pública del Gobierno de Puerto Rico para desarrollar la Región como un polo turístico de importancia nacional e internacional, dándole énfasis a la preservación de recursos naturales, únicos en la Isla y el Caribe, promoviendo así el desarrollo económico e integral de esta Región." Apéndice del peticionario, pág. 22.

33.01 del Reglamento de Planificación Núm. 4, supra, pág. 152.[38]

Por su parte, los distritos RT-3 se ubican en una zona de interés turístico y podrán desarrollarse a una intensidad intermedia.[39] En lo pertinente, los usos residenciales permitidos serán las casas en hilera y casas patio.[40] A su vez, los distritos RT-4 también se ubican en una zona de interés turístico, pero su desarrollo deberá darse a una intensidad "semi-alta" y sus usos residenciales deben darse "en edificios para casas individuales, casas de dos (2) unidades de vivienda y **casa de apartamientos** de acuerdo a lo establecido en esta Sección". (Énfasis nuestro.) Subsección 38.01 y 38.02(4) del Reglamento de Planificación Núm. 4, supra, pág. 166.

El Reglamento de Planificación Núm. 4 claramente dispone que las variaciones no pueden afectar las características de un distrito y convertirlo en otro.[41] Cuando lo solicitado es a todas luces una rezonificación no podemos servirnos de tecnicismos para permitirlo, puesto que haríamos inoperante tanto la ley habilitadora

---

[38] Los usos permitidos para dicho distrito se enumeran en la subsección 33.02. En lo pertinente, el reglamento dispone que se permitirán "[u]so residenciales en edificios de casas individuales y casas de dos (2) unidades de vivienda". Subsección 33.02(3) del Reglamento de Planificación Núm. 4, supra, pág. 152.

[39] Subsección 37.01 del Reglamento de Planificación Núm. 4, supra, pág. 162.

[40] Subsección 37.02(4) del Reglamento de Planificación Núm. 4, supra, pág. 163.

que no le delega a A.R.P.E. dicha facultad de zonificar y el Reglamento, que no le permite cambiar el distrito.

Por último, los peticionarios señalaron que los proponentes no fundamentaron su solicitud de variación y que por esta razón también A.R.P.E. no debió conceder las variaciones. Alegan que el Tribunal de Apelaciones erró al confirmar la determinación de A.R.P.E., puesto que la agencia no consideró los factores para la concesión de las variaciones solicitadas conforme a derecho.

Los reglamentos y la jurisprudencia exigen que se demuestre que la aplicación literal de las disposiciones reglamentarias a un predio particular constituye una confiscación del disfrute de dicha propiedad. Hemos resuelto que por la naturaleza del interés público, esto es necesario para salvaguardar el esquema global de planificación. Para que se conceda una variación, el proponente debe demostrar que en su caso particular, el reglamento resulta en una prohibición o restricción irrazonable e innecesariamente gravosa sobre la propiedad, pero para ello no es suficiente que se impida lo que el propietario entienda que es el uso óptimo o ideal de los terrenos. El proponente sostuvo su solicitud de variación en la existencia de "presión de desarrollo en el área y el alto costo de estos terrenos [que] no permite maximización edificando una estructura

---

[41]    Sec. 82.05 del Reglamento de Planificación Núm. 4, 6211, supra.

residencial".[42] No estamos pasando juicio sobre la situación que plantea el proponente, pero, aunque ésta pueda ser una consideración para que la Junta autorice rezonificar, no es pertinente para la evaluación de una variación. Estas razones no establecen un menoscabo confiscatorio al derecho de disfrute de la propiedad privada.

IV

Por todo lo anterior, resolvería, contrario a la Opinión del Tribunal, que los peticionarios tienen legitimación activa para solicitar la revisión judicial de la resolución de A.R.P.E. en este caso. Además, considerados los méritos de la controversia, revocaría la sentencia del Tribunal de Apelaciones y resolvería que A.R.P.E. carece de jurisdicción para entender en el proyecto en controversia, toda vez que la sección 66.01 del Reglamento de Planificación Núm. 4 lo prohíbe y porque las variaciones solicitadas realmente persiguen re-zonificar el predio.

Liana Fiol Matta
Jueza Asociada

---

[42] *Oposición a petición de certiorari*, pág. 14.